## LOWENBERG v. THE PEOPLE.

The General Sessions of New York, having protracted its regular period of sitting, in the trial of a cause, was lawfully in session for the purpose of passing judgment in another cause in which a conviction had been had prior to the commencement of the trial which prolonged the sitting.

Lowenberg v. The People.

*It seems* that the Court of General Sessions of the county of New York is within the statute (ch. 208 of 1859) authorizing Courts of Sessions in any county to continue its sitting at any term as long as may be necessary: *Per* BALCOM, J.

The act in relation to capital punishment (ch. 410 of 1860) did not abolish the penalty of death for murder in the first degree.

*It seems* that the mode of execution by·hanging was established by the common law, and, not having been abrogated by that statute, was the legal method of execution while such act was in force, notwithstanding its repeal of the Revised Statute prescribing that punishment: *Per* BALCOM, J.

It is not a sufficient challenge for principal cause that a juror had formed an opinion that the prisoner had killed the person for whose murder he was indicted. Killing being but one element of the crime, is consistent with the prisoner's innocence of murder.

Upon a conviction under the act of 1860, the court could not fix the day of execution.

The proper form of sentence under the act of 1860 indicated: *Per* BALCOM, J.

Where the Court of General Sessions improperly sentenced the prisoner to be executed on a fixed day, that being the only error in the proceedings, and the Supreme Court, after the day fixed for execution had passed, affirmed the judgment, without fixing a new day for execution, *held*, that the erroneous part of the sentence being void and having become, by the lapse of time, incapable of any operation, the error was cured.

WRIT of error to the Supreme Court. The plaintiff in error was convicted in the Court of General Sessions of the county of New York of murder in the first degree, on the 11th December, 1861, and was sentenced, on the 4th January, 1862, " to suffer the punishment of death for said murder, on Friday the 20th day of February, 1863, and that he be confined at hard labor in state prison until such punishment shall be inflicted." The case was taken by writ of error to the Supreme Court, proceedings being stayed, and after the day specified for the execution had passed the judgment was affirmed; no day being there assigned for executing the sentence. The prisoner sued out a writ of error from this court. The other material facts appear in the following opinions.

*H. L. Clinton*, for the plaintiff in error.

*Nelson J. Waterbury*, for The People.

BALCOM, J.   The term of the Court of General Sessions, at which the prisoner was tried and sentenced, was commenced on Monday; the 2d day of December, 1861, and was continued until the 4th day of January, 1862, when the sentence was pronounced.   The prisoner was tried and found guilty by the jury, on the 11th day of December, 1861.   The trial of one Jefferds was commenced in that court, on the 18th day of that month, and was concluded, by a verdict of guilty, on the 24th day of the same month.   On the 28th day of that month, the district attorney moved that judgment be pronounced upon the prisoner and Jefferds.   But the pronouncing of judgment in each case was postponed, at the request of the counsel for the prisoner, until the 4th day of January, 1862.

The prisoner's counsel now insists that the Court of General Sessions was unlawfully continued, as to the prisoner, beyond the third week in December, 1861.   The law fixing the terms of that court, until the year 1846, was, that the same should commence on the first Monday of every month, and might continue and be held until and including Saturday in the third week thereafter. (2 R. S., 317, § 31.)   But, by chapter two of the Laws of 1846, it was provided that, whenever the trial of a cause shall have been commenced in that court, " and the same shall not be concluded before the expiration of the term of said court, it shall be lawful for the said court to continue in session until the conclusion of said trial, and to proceed to judgment, if they shall so deem necessary, in cases where convictions shall be had." (Laws of 1846, p. 4.)   The trial of Jefferds had been commenced and was not concluded until the term prescribed by statute, prior to the year 1846, had expired; the court, therefore, was lawfully continued in session until the 4th day of January, 1862; which was two days before the first day of the January term in that year.   There can be no doubt that it was lawful for the court to sentence Jefferds on the 4th day of January, 1862; and I am of the opinion, it was also lawful for the court to proceed to judgment against the prisoner in this case on that day.   The court then was legally in session, and was authorized to proceed to judgment in cases where

convictions were had.    It was not restricted to proceeding to judgment in the case on trial at the expiration of the December term.    The language of the statute is too broad and com prehensive to admit of such a restricted construction.    It is, that the court may "proceed to judgment, if they shall so deem necessary, in cases where convictions shall be had.". This authorized the court to pronounce judgment upon any number of prisoners at any time before its final adjournment; for the term was lawfully continued, because the trial of Jefferds was not concluded when it would have expired, if no cause had then been on trial.

It must be presumed that the authors of the law of 1846 knew what every lawyer then knew, to wit: that prisoners were seldom sentenced at the time they were found guilty by the jury, but generally at the close of the term, after all the cases ready for trial had been disposed of.    Sentence was sometimes delayed to enable counsel to prepare and engross exceptions, and for other reasons; and during such delays other cases were taken up and tried; and having this knowledge, the legislature would have used different language if the intention had been to restrict the court to pronouncing judgment, after the expiration of the regular term, to the single case on trial when such term expired.

It is certain that the court lawfully continued its sittings beyond the third week in December, 1861, if chapter 208 of the laws of 1859 (Laws of 1859, p. 465) is applicable to it. That act provides that it shall be lawful for "the Court of Sessions of any county of this State" to continue its sittings at any term thereof, so long as it may be necessary, in the opinion of such court, for the dispatch of any business, or the determination of any cases that may be pending before such court.    The Court of General Sessions of the Peace in and for the city and county of New York is but a Court of Sessions of the county of New York, and is designated in the act of 1859, by the words, "the Court of Sessions of any county of this State."    A Court of General Sessions of the Peace and a Court of Sessions of any county are one and

the same tribunal. It is the criminal court of the county, whether held by the same or different magistrates. (*People* v. *Powell*, 14 Abbott's Reps., 91.) I am therefore of the opinion the act of 1859 authorized the Court of General Sessions of the city and county of New York to continue in session until it passed sentence upon the prisoners in this case.

The prisoner was convicted of murder in the first degree, and sentenced under the act of April 14, 1860, entitled "An act in relation to capital punishment, and to provide for the more certain punishment of the crime of murder." (Laws of 1860, p. 712.) The crime was committed after that act took effect. But the prisoner's counsel contends that that act abolished all punishment for murder " of the first degree." Section one was as follows: "No crime hereafter committed, except treason, and murder in the first degree, shall be punished with death in the State of New York." By section four it was provided: "When any person shall be convicted of any crime punishable with death, and sentenced to suffer such punishment, he shall, at the same time, be sentenced to confinement at hard labor in the State prison until such punishment of death shall be inflicted." Section 5 declared that "no person so sentenced or imprisoned shall be executed in pursuance of such sentence within one year from the day on which such sentence of death shall be passed, nor until the whole record of the proceedings shall be certified by the clerk of the court in which the conviction was had, under the seal thereof, to the governor of the State, nor until a warrant shall be issued by the governor, under the great seal of the State, directed to the sheriff of the county in which the State prison may be situated, commanding the said sentence of death to be carried into execution." That act expressly repealed section 25 of that portion of the Revised Statutes, entitled " of crimes punishable with death," which declared that the punishment of death shall, in all cases, be inflicted by hanging the convict by the neck, until he be dead. (2 R. S., 659, § 25.) And it amended section one of the same portion of the Revised Statutes, so as to read as follows: " Every person who shall

hereafter be convicted, first, of treason against the people of this State : or second, of murder; or third, of arson in the first degree, as those crimes are respectively defined in this title, shall be punished as herein provided." Provision was made in section 18 of the act of 1860 for the execution of persons, by virtue of the warrant of the governor, who should become insane after being convicted of murder in the first degree, provided ·they should subsequently become sane. Punishment with death was recognized by section 19 of the same act. And I am of the opinion that part of section 11, of the portion of the Revised Statutes above mentioned, which stated that the warrant for the execution of the sentence of death, made out by the court, should appoint the day on which such sentence should be executed, was repealed by the act of 1860, which provided for the fixing of the time of execution, if ever, by the governor. The designation of the time for executing the sentence by the governor was entirely inconsistent with the appointment of such time in the warrant for the execution of the sentence, made out by the court. Hence, conferring authority upon the governor to fix the day for executing the sentence, necessarily took away the authority before vested in the court to appoint such day.

It seems to me, that the act of 1860 clearly affirms the common law right to execute persons convicted of murder in the first degree. It nowhere professes to abolish the penalty of death for that crime ; and the right to inflict it is recognized in several different sections. The fact that the act so amended a section of the Revised Statutes, above quoted, as to declare that persons convicted of murder should be punished as therein provided, and that the section prescribing the mode of taking the lives of persons so convicted was expressly repealed, does not make the common law mode of inflicting the death penalty inapplicable to cases where that punishment is recognized by such act or the Revised Statutes as amended by that act. The words, "shall be punished as herein provided," in the act of 1860, were applicable so far as that act prescribed the extent and mode of punishment, but no farther. And if the authors

of such act intended, by the repeal of the statute declaring that the punishment of death should, in all cases, be inflicted by hanging the convict by the neck, so to alter the law as to make it impossible ever to inflict the penalty of death upon a murderer, they did not go far enough to make such intention effectual; for they stopped short of abrogating the common law, by which the mode of executing murderers had become fixed and certain. That mode was by hanging the convict by the neck until he was dead, unless he was a slave. This is shown in a very learned opinion delivered by Justice CAMP-BELL, in *The People* v. *Doane.*

The prisoner's counsel challenged Durant as a juror for principal cause, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner. But the most that was established against his competency was, that he had formed an opinion that the prisoner killed Hoffman, which he had never expressed. This was not an opinion as to the guilt or innocence of the prisoner. He might have killed Hoffman and still been innocent of any criminal offence. The court, therefore, properly overruled the challenge to Durant for principal cause; and as he was not challenged for favor, there was no error in permitting him to sit as a juror in the case. The rule respecting such challenges, was correctly stated by BEARDSLEY, J., in *Freeman* v. *The People* (4 Denio, 33). He there said: "Every challenge for principal cause, must be for some matter which imports absolute bias or favor, and leaves nothing for the discretion of the court. The truth of the fact alleged, and that alone, is in question. Its sufficiency, as a ground of challenge, is conceded by omitting to demur and taking issue on the fact. It is otherwise, on a challenge for favor. That must be determined by triers, who are to pass upon the question of actual bias or favor." Within this rule, the ground of challenge to Durant was not proved. Before it could be said it was established, the proof must have been that he had formed and expressed an opinion as to the guilt or innocence of the prisoner, or at least that he had formed such an opinion. It is clear, that the forming of an opinion that

the prisoner had done one act necessary to be shown, among others, in order to convict him, was not the forming of an opinion that he was guilty of murder or of any other crime.

The foregoing views lead to the conclusion, that the prisoner was lawfully convicted of murder in the first degree.

But I am of the opinion, the Court of Sessions erred in adjudging that the prisoner should suffer death on a particular day. The day on which he should be executed, if ever, should have been left for the governor to designate. The proper sentence would have been, that the prisoner suffer death for the crime of murder in the first degree, in killing Samuel Hoffman, at the city of New York, on the 14th day of November, 1861, whereof he has been duly convicted, by being hung by the neck until he be dead, by the sheriff of the county in which he shall be imprisoned, at such place and time, after the expiration of one year from the date of his sentence, as such sheriff shall be commanded, by a warrant issued by the governor, under the great seal of the state; and that he be confined in the State prison, at hard labor, until such punishment of death shall be inflicted.

The court fixed a day for the execution of the prisoner, so he was to be confined in the State prison at hard labor more than thirteen and a half months before he could be executed, when by the act of 1860 he could be so confined only one year, if the governor should so determine, and issue a warrant for his execution.

The Supreme Court could not lawfully affirm this judgment. Its duty was to reverse it. [The majority of the court differed from the learned judge in this conclusion, as will appear at the close of the case.]

When the case was before that court, the statute was as follows: "If the Supreme Court shall reverse the judgment rendered, it shall direct a new trial, or that the defendant be absolutely discharged, according to the circumstances of the case. (2 R. S., 741, § 24.) The act of 1863 (Laws of 1863, p. 406), amending this section, was passed after the judgment was pronounced, and, therefore, is *ex post facto* as to this case,

and cannot influence our decision in it. We must, therefore, determine whether, according to the common law, the Supreme Court should have directed a new trial, or that the defendant be absolutely discharged, according to the circumstances of the case.

In *The King* v. *Ellis* (5 Barn. & Cress., 395), the prisoner was sentenced to be transported for fourteen years, when, according to law, he could only be transported for seven years, and the Court of King's Bench reversed the judgment, and discharged the prisoner, holding that there was no ground to send it back to be amended. In *The King* v. *Bourne and others* (7 Adol. and Ellis, 58), it was held, where an erroneous judgment is given by an inferior court, on a valid indictment (as by passing sentence of transportation in a case punishable only with death), and the defendants bring error, the appellate court can neither pass the proper sentence, nor send back the record to the court below, in order that they may do so; but the judgment must be reversed, and the defendants discharged. In *Shepard* v. *The Commonwealth* (2 Metcalf, 419), the prisoner was sentenced to be imprisoned four years, when the limit was three, and the Supreme Court of Massachusetts reversed the judgment and discharged him. And that court subsequently, in *Christian* v. *The Commonwealth* (5 Metcalf, 530), laid down the following rules, namely : " When a judgment in a criminal case is entire, and a writ of error is brought to reverse it, though it is erroneous in part only, it must be wholly reversed. The court, after reversing a judgment in a criminal case, cannot enter such judgment as the court below ought to have entered, nor remit the case to the court below for a new judgment. These rules were approved by BRONSON, Ch. J., in *The People* v. *Taylor* (3 Denio, 91.)

My conclusion is, as the only error the Court of Sessions committed was in giving a wrong judgment, in part, against the prisoner, no new trial can be legally granted; and that the judgment must be wholly reversed, and the prisoner discharged.

I regret that I am forced to this conclusion, for it is quite

clear that the prisoner is guilty, and will escape just punish·ment. But this result cannot be avoided, for it is for the legislature, and not the courts, to alter the laws, in order to prevent the guilty escaping the punishment they deserve.

WRIGHT, J. (dissenting.) The defendant having been tried and convicted, in the Court of General Sessions, the case may be reviewed on the merits. (Laws of 1855, ch. 337.) I have, therefore, attentively examined the evidence, and think it justified the verdict. The case, it is true, in its general aspect, is somewhat remarkable. A man of education, of apparently reputable standing, and ordinarily peaceable disposition, upon the most trivial provocation, with a deadly weapon, assaults and kills a fellow tenant. But the fact of killing was not disputed; and the testimony tended to the conclusion, that the act, in the language of the statute, was "willful, deliberate and premeditated." The accused stabbed his victim, not once, but thrice, and in such places as he knew would inevitably produce death. The pretext that this was done in self-defence was wholly unsupported by the evidence. The only witness of the transaction disproved any violence on the part of the deceased; and a subsequent examination of the person of the prisoner showed no marks of an assault, except that the skin was slightly ruffled over his left eye.

Apart from the merits, however, there is a question of grave importance. The defendant was indicted under the statute of 1860, for the crime of murder. (Laws of 1860, ch. 410.) That statute defined the crime anew, dividing it into first and second degrees. The defendant was found guilty of murder in the first degree, and was sentenced to suffer the punishment of death, some thirteen months afterwards, and to be confined at hard labor in the State prison, until such punishment should be inflicted. It was urged, on motion in arrest of judgment, that there was no authority in law for pronouncing any sentence upon a conviction for murder in the first degree. I confess that I discover difficulty in successfully meeting the

objection, if the ordinary rules applicable to the construction of penal statutes are to be applied.

The Revised Statutes declared that every person convicted of murder, as defined therein, should suffer death for the same. (2 R. S., 656, § 1.)  It was further declared, that the punishment of death should in all cases be inflicted by hanging the convict by the neck until dead. (§ 25.)  By the act of April, 1860, section one of title one of chapter one of part fourth of the Revised Statutes, was amended so as to read as follows: "§ 1. Every person who shall hereafter be convicted, first, of treason against the people of this state; or, second, of murder; or, third, of arson in the first degree, as those crimes are respectively declared in this title, shall be punished as herein provided;" and the section of the Revised Statutes prescribing the mode of inflicting the punishment of death, was expressly repealed. (Act of 1860, §§ 7, 11.)  As thus amended, there was no penalty prescribed in the Revised Statutes for the crime of murder, nor indeed of treason, the amendment displacing the words, "shall suffer death for the same," and inserting in lieu thereof the words, "shall be punished as herein provided;" that is, as provided in the act of 1860. The effect was, to repeal the provisions of existing statutes for the punishment of death on convictions for the crime of murder.  The offence was left without any legal penalty attached to it.  The question therefore is, whether, in 1860, in defining the crime anew, and dividing it into degrees, the legislature prescribed the punishment.  If there was an omission, through neglect or design, to specifically declare the punishment to follow a conviction for murder in the first degree, as defined in the act, the court was without legal authority to impose any punishment upon the convict.  The defendant was convicted of murder in the first degree, under the act of 1860, and the authority for his punishment must be found in it.  Although murder was an offence at common law, yet murder in the first degree, and murder in the second degree, are offences entirely of statutory creation.  Nor can resort be had to the preëxisting law, to ascertain the punishment and the mode of its

infliction; for that was displaced by a repeal, to make room for the substituted system, and cannot be resorted to for any purpose. .

The act of 1860 did not specifically prescribe any punishment for the offence of murder in the first degree. The extent that can be claimed is, that the legislative intention, that the penalty should be death, is inferable from the provisions of two or three sections. The act begins with the declaration, that "no crime hereafter committed, except treason, and murder, in the first degree, shall be punished with death in the State of New York." What shall constitute murder in the first and second degrees, is then declared. By section 4 it is provided, that " when any person shall be convicted of any crime punishable with death, and sentenced to suffer such punishment, he shall at the same time be sentenced to confinement at hard labor in the State prison until such punishment of death shall be inflicted. The presiding judge of the court at which such conviction shall have taken place shall immediately thereupon transmit to the governor of the State, by mail, a statement of such conviction and sentence, with the notes of testimony taken by such judge on the trial." The 5th section provides that "no person so sentenced or imprisoned shall be executed in pursuance of such sentence within one year from the day on which such sentence of death shall be passed, nor until the whole record of the proceeding shall be certified by the clerk of the court in which the conviction was had, under the seal thereof, to the governor of the State, nor until a warrant shall be issued by the governor, under the great seal of the State, directed to the sheriff of the county in which the State prison may be situated, commanding the said sentence of death to be carried into execution." The sixth section declares specifically, that "every person convicted of murder in the second degree shall be sentenced to undergo imprisonment in one of the State prisons, and be kept in confinement at hard labor for his or her natural life." The 8th section amends section 18 of title 1 of chapter 2, part 4 of the Revised Statutes, in respect to the inquisition of the

jury in case of an insane convict, and provides that, "if it be found by such inquisition that such convict is insane, the sheriff shall convey said convict to the lunatic asylum for insane convicts, there to be kept at the expense of the State until such time as the superintendent thereof shall certify to the governor that said lunatic is sane, and the governor may, thereupon, issue his warrant for his execution, if he was convicted of murder in the first degree, or may direct that he be imprisoned in one of the State prisons, according to law." The 9th section is as follows: "§ 9. The provisions of this act for the punishment of murder in the first degree shall apply to the crime of treason; and the punishment of murder in the second degree shall apply to all crimes now punishable with death, except as herein provided." By section 11 all the provisions of the Revised Statutes are repealed that related to the term of execution for capital offences; that made it the duty of the judge to transmit to the governor a statement of conviction and notes of the testimony; that authorized the governor to require the opinion of the judges or attorney-general; that provided for an inquisition in relation to pregnancy of female convicts, and empowered the governor, if the female was no longer quick with child, to either issue his warrant for her execution, or, in his discretion, commute her punishment to perpetual imprisonment; that authorized the Supreme Court to issue a warrant for the execution of the sentence after the day originally fixed for such execution had passed; and that provided that the punishment of death should be inflicted by hanging.

From this synopsis of the act, it appears that it contains no special provision for the punishment of murder in the first degree. It seems, however, to have been supposed that the act did provide for the punishment of that offence, for the 9th section declares that "the provisions of this act for the punishment of murder in the first degree shall apply to the crime of treason." This can only be explained, or the act rendered intelligible, upon the supposition that the bill, as originally prepared, contained a separate provision for punishing, capi-

tally, the newly created offence of murder in the first degree, and that it was accidentally or designedly omitted in the bill that became a law. It can scarcely be explained on the theory, that in the 1st section of the act there is an implication, in the nature of a negative pregnant, that the crime should be punished with death, for the implication is equally strong, that treason was to be punished in that way; and hence, in this view, the provision of the 9th section would be unmeaning.

Assuming, however, that it may be implied from the 1st or the 4th and 5th sections of the act, that the legislature intended to punish murder in the first degree with death, after a year's imprisonment at hard labor, it remains true, that the act does not, in terms, prescribe that or any other punishment for such offence. The draftsman of the bill may have supposed that in the sections referred to he had declared the offence punishable with death; but it is manifest that neither in these sections, nor elsewhere in the act, is there any express provision for the punishment of the crime. Unless, therefore, the authority to punish crime, and the power to punish, by death, the particular crime of which the defendant was convicted, may be deduced by implication or inference, no such power existed in this case.

I suppose that there is no more inflexible rule, or one better settled, than that a penalty cannot be raised by implication, but must be expressly created and imposed. Penal statutes, both as regards the definition of the crime and the punishment, are to be taken strictly and literally, and cannot be extended by construction. If the legislature creates an offence, and omits in terms to annex a penalty, there is no authority in the courts to punish. They cannot, in extension of the letter of the law, assume anything by implication. These principles are elementary, and too well sustained by authority to need discussion. (Dwarris on Statutes, 634; *Daggett* v. *State*, 4 Conn., 60; *United States* v. *Wiltberger*, 5 Wheat., 95; *Commonwealth* v. *Duane*, 1 Binney, 601; *Berry* v. *Ripley*, 1 Mass., 167; *Law* v. *Killmer*, 1 Dutcher, 522.) "It is the legislature," says Chief Justice MARSHALL, in *United States* v. *Wiltberger*,

" not the court, which is to define a crime and ordain its punishment." What is this case? The legislature has defined the crime of murder in the first degree, but made no provision for its punishment. It is said that there are portions of the act raising a strong implication that the legislature intended to punish the crime with imprisonment in the State prison and death; and hence the statute is to be construed as prescribing that punishment. No penal statute, involving the life or liberty of a citizen, was ever so construed; but, on the contrary, the principle that the offence described, and the punishment, must come within the letter and spirit of the statute, runs through all the adjudged cases.

At the time, therefore, that the defendant was tried and convicted, and the Court of General Sessions assumed to sentence him, there was no law for the punishment of the crime of which he was convicted. There certainly can be no force in the suggestion that, the legislature having failed to specifically provide for punishing murder in the first degree, the ninth section of the act applies the punishment for murder in the second degree to the first-named crime. Such a construction would have neither implication nor the letter of the statute to rest upon. If this convicted criminal shall escape punishment, it is but another consequence of the imperfect and inconsiderate legislation of 1860, in respect to capital offences and their punishment. The fault lies, not with the judicial, but with another department of the Government.

On the ground, therefore, that there was no authority for the judgment pronounced against the defendant, I am of the opinion that such judgment should be reversed and the defendant discharged.

EMOTT, J., concurred in this opinion. DENIO, Ch. J., DAVIES, SELDEN and MARVIN, Js., concurred with BALCOM, J., in the opinion that the court had power to pronounce sentence of death. All the judges concurred that the judgment was erroneous in fixing the day of execution. But DENIO, Ch. J., DAVIES, SELDEN, ROSEKRANS and MARVIN, Js., were for affirm-

ance, upon this ground, as understood by the Reporter: So much of the sentence as fixed the day of execution was absolutely void. The day so fixed being more than a year subsequent to the sentence, the Governor, but for the stay of proceedings upon the entire judgment, might have directed the execution to take place on any day after the expiration of a year. The convict having procured the stay of proceedings until the day of execution had passed, the error had, by his own act, become wholly immaterial, and he could not require the Supreme Court to reverse a judgment otherwise unobjectionable, on account of a separable addition thereto, void in itself, and which the lapse of time had rendered wholly nugatory. No error being found in that part of the judgment which remained, capable of any operation, the Supreme Court were right in affirming it. WRIGHT, EMOTT and BALCOM, Js., were for reversal.

Judgment affirmed.