---
Lanergan *v.* The People.

---

New trial granted.

[New York General Term, November 4, 1867. *Leonard, Clerke* and *Sutherland,* Justices.]

———•••———

Maurice Lanergan, plaintiff in error, *vs.* The People, defendants in error.

Premeditation proves a malicious intention, when applied to a homicide; and when the killing occurs with an intent to effect death, however instantaneously the intent is formed prior to the commission of the deed, the crime is murder.

Under the law as it existed prior to 1860, the penalty of that crime was death. Since the act of 1862, such killing is murder in the first degree, and the penalty is the same. The word "premeditated" is used in the same connection in the old and in the present statute, and must have the same meaning and construction.

It was the intention of the legislature, by the act of 1862, dividing the crime of murder into two degrees, (*Laws of* 1862, *ch.* 197, § 5,) to embrace killing, without premeditation or design, by a person in the commission of a felony other than arson in the first degree, within the definition of murder in the second degree.

A construction which should obliterate the last " or " occurring in section 5 of the act, would remove the obscurity now existing, and give an express affirmative definition to murder in the second degree, and be in harmony with the intention of the legislature. *Per* Leonard, P. J. (Sutherland, J. dissented.)

Requests to charge which assume that an intent to kill, formed at the time of the commission of the act, will not be evidence of premeditation, are not consistent with the rule of law on that subject; and the judge is not bound so to charge.

Lanergan *v*. The People.

Drunkeness is no excuse for crime; and one who is voluntarily in that condition must take the consequences of his own acts.

Evidence of intoxication is admissible in every trial for murder, because it may tend to cast light upon the acts, observations or circumstances attending the killing.

Intoxication must result in a fixed mental disease of some continuance or duration, before it will have the effect to relieve from responsibility for crime.

An indictment for murder charged the prisoner with killing the deceased, in the first count, with a knife; in the second with an axe; and in the third, by beating and choking. *Held* that there was no error in the judge refusing to require the public prosecutor to elect between the three counts in the indictment.

*It seems* that the court of general sessions in the city of New York has power to entertain a motion for a new trial.

WRIT of error to the court of general sessions of the city of New York. The facts are sufficiently stated in the opinion of the court.

*Wm. F. Kintzing,* for the plaintiff in error.

*A. Oakey Hall,* (district attorney,) for the people.

LEONARD, P. J. Maurice Lanergan was indicted, tried and convicted in the court of general sessions of the city of New York of murder in the first degree, and sentenced to be executed. The case comes up before this court upon a writ of error.

The indictment charges Lanergan, in three counts, with killing Delia Lanergan, first, with a knife; second, with an axe; third, by beating and choking. The deceased was the wife of the accused. Both began to use intoxicating liquors excessively on St. Patrick's day, and continued to do so, becoming more and more subjected to intoxication, till the evening of March 26, 1867, when the death of Delia occurred by violence.

They occupied two rooms in a tenement house on Washington street, on the second floor; one of which they let for

a lodging room to Tully and Cram, who were witnesses at the trial.

John Sullivan, (stated in the charge of the recorder to be a lad of thirteen years,) testified that he resided in the same house. That towards evening, about two hours and a half after the school, which he attended, had closed for the day, or about five and a half o'clock, P. M. he was going down stairs, and saw Mrs. Lanergan on the floor, near the door of the rooms which the accused, with his wife, occupied, and the accused then beating her with something he had in his hand. He could not see what the accused had in his hand. When Lanergan saw the boy, he " drew the thing back," and put his hand over the mouth of the deceased. Tully, one of the lodgers, came out of the door, and went down stairs, passing the witness. Lanergan closed the door. Nothing appears to have been spoken by any one at this time. He does not mention any noise. Thomas Carron testified that he occupied a room adjoining that of Lanergan. A little before night, half an hour or so, on the day of the occurrence, he heard three knocks, as it might be of an axe or sledge, in Lanergan's room. In less than an hour he saw Lanergan come out of the room, go down stairs, and out of the house. When Carron left his own room, the door of Lanergan's room was closed. Nothing was said by either of them. Later in the evening he heard Tully in Lanergan's room hallooing and clapping his hands. He thinks it was about ten o'clock. He went into the room, and saw the deceased lying upon the bed, dead. He heard no scream when he heard the knocks. After this he went at once for the sister of the deceased, Mrs. Hickey, and met Lanergan on the way to his rooms. Lanergan was then returning from Mrs. Hickey's residence, where he had been, and informed her that his wife was dead. Tully testified that Lanergan and his wife were in bed when he left the house to go to his business on the morning of the 26th of March. He returned between six and six and a half o'clock, P. M. and saw Mrs. Lanergan then

in bed. Lanergan told the witness he had better get his supper. He left the house, got his supper, and appears to have met Lanergan at about eight o'clock, when the two, together with John Hickey, the brother-in-law of Lanergan, took a drink at a public house. They played dominoes at another public house, near by, till after ten o'clock. Tully then went to his room at Lanergan's house, having a night key, with which Lanergan had supplied him. He thought Lanergan under the influence of liquor when he left him. Tully went to the rooms, went in, lit a light, saw Mrs. Lanergan in bed ; called, but got no answer ; went over, and listened to hear her breathe ; laid his hand on her chest, and found it cold. He then gave the alarm, and called the neighbors.

The week previous Tully saw Lanergan strike the deceased, (who was under the influence of liquor, and in bed,) with a broom handle upon her hip to keep her quiet. She was striving to get up, and made a racket, and Lanergan struck her to keep her quiet. ·

Tully testified that he left the house at $7\frac{1}{2}$ that morning, and did not return until $6\frac{1}{2}$ P. M. Was not at the room at $5\frac{1}{2}$ P. M. Did not see Lanergan beat his wife, while she was on the floor. He knows the boy Sullivan by sight. Did not pass him at the time of such an occurence as the lad testified to.

Cram, who occupied the room with Tully, as a lodger, testified that he took Lanergan home about one o'clock, on the day of the occurence, from the residence of Hickey, where they had dinner. That Lanergan was very drunk and staggered against his wife when he went in, grabbed her, and " went to strike her," but Cram calling to him, not to strike her for God's sake, and the deceased repeating the words, he staggered into the rocking chair. From his actions, Cram was satisfied that Lanergan was so drunk, that he did not know any thing. Cram then advised her to lie down. She inquired of Cram if he thought Lanergan would

kill her. He replied, "no! what humbug!!" Cram says, that Lanergan was then asleep in the rocking chair. The prisoner's counsel objected to this evidence. The court overruled the objection, and an exception was taken. The witness then further testified, "I told her it was humbug, or something to that effect; Mrs. Lanergan asked me not to go out, but to put him to bed. I went and asked him, said I, Maurice, get into bed, I then assisted him to get into the bed. I then left the house." Lanergan took his dinner that day at Hickey's and was then quite intoxicated. Referring to the drunken condition of his wife, he said with an oath, while at Hickey's, that he would kill her. Hickey did not think that he meant any harm by this threat. Mrs. Hickey said to Lanergan, "you know you have a good wife;" Lanergan cried and praised the goodness of the deceased. On an examination of the room occupied by Lanergan, made the next morning, an axe was found there with blood on it. The post mortem examination showed a contusion upon the side of the head, made with some blunt instrument. The dura-mater, or membraneous covering of the brain, was ruptured, immediately under the contusion, but the skull was not fractured. There was also a broken broom handle in the room. A knife was taken from the pocket of the prisoner at the station house, and the policeman who made the arrest and was examined as a witness, testified that he thought the blade appeared to have been recently rubbed.

It should be further observed, that the post mortem examination disclosed only a local extravasation of blood at the place where the skull and dura-mater were bruised, but there was nothing showing that the brain was not otherwise in a healthy condition. The face, arms and legs of the deceased appeared to be black and blue, and exhibited signs of bruising. The witness also speaks of her face as swollen and discolored before the fatal occurrence took place. It is also proven that she had fallen down a flight of stairs. Several witnesses testified to the general good character of

Lanergan *v.* The People.

Lanergan, as a quiet, peaceable and inoffensive person, not quarrelsome, but very peaceable in his disposition.

After the evidence was closed, the prisoner's counsel requested the recorder to charge the jury: "That in order to constitute murder in the first degree, the premeditation must have existed prior to the immediate occurrence which resulted in death," also, "that if upon a sudden quarrel or meeting between both parties, one kills another designedly and with malice, there being no previous deliberation, it is the duty of the jury to treat such as a case of murder in the second degree." Also, "that the fact of the intoxication of the prisoner, if proved to the satisfaction of the jury, is a proper matter to be considered by the jury in determining the question as to whether his mind was in such a condition as to be able to form an intent to kill, or a premeditated design to effect death."

There were other requests made to charge as to the law, but no question has been raised here in respect to any other.

The recorder refused to compel the district attorney to elect upon which of the three counts in the indictment he would claim a conviction, and to his refusal there was an exception.

The prisoner's counsel moved for a new trial, on the ground that the verdict was against the law and the evidence. Argument was then had by the prisoner's counsel and the district attorney, as to the power of the court to entertain the motion. The recorder said, that assuming that he had the power to hear the motion, (but not passing upon that question,) no argument would induce him to grant a new trial, either upon errors of law or of fact, and thereupon denied the motion. Upon being further requested to decide whether the prisoner had the right to move for a new trial in that court, upon the merits, the recorder further said, "I decide that this court has not that power." The counsel for the prisoner then said, "We except to your honor's refusal to entertain the motion for a new trial."

The prisoner's counsel also insists before this court, upon the present appeal, that the verdict is against the evidence. The recorder did not, in his charge, declare the law in conformity with the requests above stated, made by the counsel for the prisoner.

Previously to the act of 1860, the law was well settled that an intent to kill, formed on the instant of the killing, was proof of premeditation, and established the malicious intent necessary to constitute the crime of murder. The use of numerous adjectives in the act of 1860, defining murder in the first degree, as " willful, deliberate, and premeditated " killing, and the enactment of a second degree of murder not punishable by death, induced the judges of the first district, or some of them at least, to hold, that an intent to kill, formed at the instant of killing, was not such premeditation as the new statute contemplated. This construction was further confirmed by the immediate conjunction of the adjectives cited above, with a reference to specific acts of murder in the first degree, by poison and lying in wait, involving a premeditation of some considerable time, and embodying the idea of a preconceived plan. Certain other acts of killing while in the commission of specific crimes, were also declared to be murder in the first degree, without any reference to malice or premeditation. It is not necessary now to decide whether the construction given to the act of 1860, was correct or not. The act of 1862, while retaining the division of two degrees in the crime of murder, has provided three very distinct definitions of murder in the first degree. The first declares that the killing of a human being with a premeditated design to effect death, shall be murder in the first degree. This definition is the same as the first definition of the crime in the statutes prior to 1860. The application of the term "*premeditated*" to an intent formed on the instant of the killing, so well established by the courts as proof of a malicious intent to commit murder, must be deemed to have been understood by the legislature, and that

it was intended that there should be no change in the meaning or application of that term, as applied to the killing of a human being. Premeditation proves a malicious intention, when applied to a homicide; and when the killing occurs with an intent to effect death, however instantaneously the intent is formed prior to the commission of the deed, the crime is murder. Under the law, as it existed prior to 1860, the penalty of that crime was death. Since the act of 1862, such killing is murder in the first degree, and the penalty is the same. The word "premeditated" is used in the same connection in the old and in the present statute, and must have the same meaning and construction. The definition of murder in the second degree is exceedingly obscure under the act of 1862. A slight verbal alteration will make it definite and certain, and not unreasonable, or, perhaps it is better to say, not without reason. As it reads literally, there is no affirmative definition of murder in the second degree. The second degree, as the act reads, is such murder as is not within the definition of murder in the first degree.

The last sentence of section 5, defining the crime of murder, as contained in the act of 1862, reads as follows: "Such killing, unless it be murder in the first degree, or manslaughter, or excusable or justifiable homicide, as hereinafter provided, or when perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the second degree."

The inquiry occurs, why except from the definition of murder in the second degree the killing of a human being by a person engaged in the commission of a felony, although perpetrated without any design to effect death? Such killing was formerly murder, and the penalty death, when no division of the crime of murder into first and second degrees existed. Under the statute, as it existed prior to 1860, such killing was embraced in the third definition of murder, in express language. The first and second definitions of murder

in the first degree, as contained in the act of 1862, are the same, *verbatim*, as contained in the definition of murder by the statute before the division of that crime into two degrees. The third definition of murder in the first degree, by the act of 1862, includes killing only when perpetrated in committing arson in the first degree. The third definition of murder by the statute, in force prior to 1860, was in these words: "When perpetrated without any design to effect death, by a person engaged in the commission of any felony." The third definition of murder is the only part of the former law that has been modified. In other respects, the three definitions of murder in the *first degree* are the same now as those of *murder*, contained in the statute before 1860. A further reference to the statutes is in vain to find what crime is committed by the killing of a human being, "when perpetrated without any design to effect death, by a person engaged in the commission of any felony." As the statute now reads, such killing is not murder in the first degree, and it is excepted from the definition of murder in the second degree ; nor is it found in any other portion of the statutes punishable as a crime. Clearly, it could not have been the intention of the legislature to exempt such a class of crime from any punishment. I will not undertake to declare in this case that the statute, as now existing, can be amended by any judicial construction. It is not necessary so to do. I will barely suggest that an obliteration of the last "or," occurring in the sentence of section 5 in the act of 1862, defining murder in the second degree, will remove the obscurity now existing, and give an express affirmative definition to murder in the second degree, in harmony with the modification of the third definition of murder, as contained in the statutes prior to 1860, into murder in the second degree, except in the single instance of killing when perpetrated in committing arson in the first degree. It will, perhaps, not be too much to say that, in my opinion, such an amendment by judicial construction will be in harmony

Lanergan *v.* The People.

with the intention of the legislature. It will, I think, be impossible to conceive of any definition of murder, as embraced in the law prior to 1860, not now defined to be murder in the first degree, except killing, without premeditation or design, by a person in the commission of a felony other than arson in the first degree. The conclusion is entirely satisfactory to my mind, that it was intended to embrace killing, under the circumstances last mentioned, within the definition of murder in the second degree, by the act of 1862. Unless this class of homicide be included, there is no crime embraced in the present definition of murder in the second degree.

I expressed the same opinion substantially in the case of *The People* v. *Skeehan,* recently decided by the general term in this district, (49 *Barb.* 217,) without any elaboration or course of reasoning by which I had reached that conclusion. A reference to that opinion by the counsel for the prisoner has induced me to make this explanation. My reasons have now been given, as they ought to have been in the former case, that the conclusion there stated may stand only for so much as it shall prove to be judicially worth. No doubt it would be better that the amendment should be made by the legislature, rather than left to the construction of the judiciary.

It is evident from the previous observations, that the recorder committed no error in declining to charge in conformity with the first two requests of the prisoner's counsel relating to premeditation and deliberation, as applicable to murder in the first and second degrees. Both requests assume that an intent to kill, formed at the time of the commission of the act, will not be evidence of premeditation. The rule of law is otherwise, and the requests are not consistent with the rule.

The remaining request is in reference to the mental condition of the prisoner arising from his intoxication which the recorder was requested to instruct the jury they might take

into consideration in determining whether he was able to form an intent to kill, or a premeditated design to effect death.

The evidence established that the prisoner had been drinking intoxicating liquors for some days ; and that he was very much intoxicated at one o'clock, some four or five hours before the probable time when the killing occurred. Carron, one of the witnesses, saw him go out of the house leaving his wife there dead, from violence which he had inflicted, and he required no assistance to walk ; neither doing any thing to call for a remark, so far as it appears from the evidence, nor making any observation ; but knowing sufficient to conceal his crime for several hours, and until her death was discovered, and the alarm given, at or about ten o'clock in the evening. After passing the evening at different public houses from the time he left his own rooms after the murder, (between six and seven o'clock,) until ten o'clock, he went to the residence of the sister of his deceased wife, and informed her that his wife was dead. He then returned to his own rooms, and neither did or said any thing, tending to show any want of his usual intelligence or understanding, so far as appears from the evidence. There are few instances of persons who have in a state of intoxication, taken the life of another who could refrain from saying or doing something which would tend to inculpation for nearly four hours after the commission of the act. There is no evidence tending to establish the existence of any mental disorder or aberration at the time of the offense committed. There was no evidence to show that the will of the prisoner was not entirely the regulator of his conduct. The rule appears to be that drunkenness is no excuse for crime, and that the person who is voluntarily in that conditionmust take the consequences of his own acts. (*People* v. *Rogers*, 18 *N. Y. Rep.* 9.) It appears, too, from the same case, that intoxication may be adverted to where ".you would not infer a malicious intent," or where the accused has

Lanergan *v.* The People.

been aggravated by the conduct of the deceased, but not where the killing was caused by the use of a dangerous instrument. The evidence of intoxication is admissible in every trial for murder, because it may tend to cast light upon the acts, observations, or circumstances attending the killing. Intoxication must result in a fixed mental disease of some continuance or duration, before it will have the effect to relieve from responsibility for crime. There was no error in refusing to charge as requested upon the subject of intoxication.

Nor was there any error in refusing to require the public prosecutor to elect between the three counts in the indictment. The prisoner was apprised of the charge, and that proof would be produced to show that the crime was committed in one of the several ways in which it was charged. The conviction is for murder in the first degree, the crime charged in each count, and not of the facts which constitute the offense. In Colt's case the indictment charged the killing with an instrument unknown, in one count, and in another with a hatchet. The indictment was sustained upon appeal; and also the admission of evidence tending to show that the killing was committed by a ball from a pistol, a weapon not mentioned in the indictment, and the evidence was admissible only under the general count, of killing with an unknown instrument.

In the present case, there was evidence tending to prove that the offense was committed with an axe. The prisoner also had a pocket knife, which the policeman thought had been recently rubbed, leaving a possible inference that an attempt had been made to remove the stain of blood. The evidence, or rather the probability, of the commission of the offense with the knife was very slight. From the evidence of the boy Sullivan, there was more probability that the offense was committed by beating or choking. I can perceive no inconsistency in the conviction had under these counts, and no injury to the defense, or the fairness of the trial. The recorder denied the motion for a new trial upon the merits.

Lanergan *v.* The People.

He declared that he would not grant a new trial for any error of law or fact appearing in the case, assuming that he had the power to hear the motion. He was afterwards invited to declare whether he had the power to entertain the motion, and he gave his opinion that he had not the power. I think upon the authority of *Lowenberg's case,* in the Court of Appeals, (27 *N. Y. Rep.* 336,) that the recorder was mistaken in his opinion, but if he had granted a new trial, his mistake would have been much greater ; it would have beenn a error.

There was no errror in admitting the evidence of the conversation between the witness Cram and the deceased. Lanergan was present, and although very drunk, it appears that he was not wholly insensible, although Cram says he was satisfied that Lanergan was so drunk he did not know any thing ; for it appears that he immediately afterwards asked Lanergan to get into bed, and he complied, with the assistance of Cram. The conversation was wholly immaterial, as affecting the result. It showed that Cram did not believe Lanergan would kill her, while she had so much apprehension as to ask the opinion of Cram about it. The evidence tended to prove an absence of malice, rather than the contrary.

There was also some reason to doubt the exact truth of the evidence that the prisoner was "so drunk that he did not know any thing," and that "he was asleep," and in that aspect it was admissible, and competent for the jury to pass upon its weight or sufficiency as evidence.

Upon the merits, the judgment is, in my opinion, correct. I am unable to perceive that there is any error of law or fact, or that any injustice had been done by the conviction. There appears to be no evidence showing any motive to induce the commission of the crime. The evidence of the lad, Sullivan, proved that Lanergan attempted to conceal the act which he was committing, and suppress any attempt his wife might make with her voice to give an alarm. It is true that the evidence of the lad was contradicted by Tully, but both were before the jury, and it was their province to decide upon the

credibility of the two witnesses. The prisoner also concealed the killing for several hours. He has never admitted the killing by himself, and claimed that it was an accident, or for any cause excusable ; at least there is no evidence of any such admission. Concealment, it is well settled, is evidence of malice, of a premeditated design to commit the deed. If he had not intentionally committed the killing, some human emotion would have induced him to betray his sorrow or his consciousness of his own overwhelming disaster.

The evidence of the sounds heard in the room of Lanergan by Carron ; the axe found there with marks of blood on it ; the contusion upon the head of the deceased with a blunt instrument ; the fact that the deceased and the accused were left together in their rooms at one o'clock by Cram, when she was last seen alive ; that he was seen to leave the rooms shortly after the heavy sounds or knocks heard by Carron ; that Tully found the door locked when he returned at about ten o'clock, no one appearing to have been there after Carron saw Lanergan leaving the place ; that after passing the evening away from his room, from the time he left there when Carron saw him, till about ten o'clock, when, without any one giving him the information, he was able to go to the residence of Hickey and inform Mrs. Hickey that his wife was dead, he having previously omitted to make any mention of the fact to Tully or to his brother-in-law, Hickey, with whom he had passed a considerable portion of the evening ; all these facts, aside from the evidence of the lad, Sullivan, make a strong case of premeditated murder. Tully saw Mrs. Lanergan in bed, as he thought, at 6 or 6½ o'clock, P. M. and Lanergan advised him to get his supper elsewhere. It is probable, from the evidence of Sullivan and Carron, as to the time when the former saw Lanergan striking his wife, and the latter heard knocks as with an axe or sledge, that the murder had been then committed. Tully was mistaken in supposing that she was alive and lying down in her dress. If so, then the skill with which Lanergan induced Tully to go away

The People *v.* Pacific Mail Steamship Company.

was sufficient to rebut any idea of stupefaction from intoxication, and to establish premeditation or design in the commission of the killing.

In my opinion the judgment should be affirmed.·

CLERKE, J. concurred.

SUTHERLAND, J. I concur in the conclusion, but I would suggest that the presiding judge is certainly mistaken in his construction of the fifth section of the act of April 12th, 1862. The last " or " in that section should be read " and."

Compare that section with section 4th. The killing, without premeditated design, in the commission of a felony, is not excepted in the last sentence of the fifth section, but is made murder in the second degree, by it. The whole act, and especially section fifth, is crudely drawn. but I think its meaning is quite plain.

Judgment affirmed.

[NEW YORK GENERAL TERM, November 4, 1867, *Leonard, Clerke* and *Sutherland,* Justices.]