WILLIAM FOSTER, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

If the facts proved upon a criminal trial are capable of two constructions, or if, in one view of the evidence, a particular intent may be found, and yet the facts may justify the finding of an intent involving another degree of guilt, the court is bound, upon the request of the prisoner, to declare the rule of law applicable to the case in either aspect.

To constitute murder in the second degree, under the act of 1862 (chap. 197, Laws of 1862), the killing must be by a person engaged at the time in the commission of a felony, other than arson in the first degree.

Section 36 of the article of the Revised Statutes entitled "Of rape, maiming," etc. (2 R. S., 665, § 34), was intended as a statute definition of the crime of mayhem, and the term now includes only those injuries therein enumerated. A blow, aimed at and delivered upon the head, cannot constitute the crime of assault and battery, with intent to maim.

The prisoner intentionally aimed a blow, with an iron rod, at the head of the deceased, with a force likely to fracture the skull, and which did in fact crush it. The prisoner's counsel, upon the trial, requested the court to charge that, upon the indictment and evidence, the jury could convict the prisoner of murder in the second degree, and that if the prisoner killed the deceased by an assault upon him with a dangerous weapon, with intent to maim but without any intent to effect death, such killing was murder in the second degree. The court refused so to charge. *Held*, no error; that there was no evidence in the case which would justify the finding that the prisoner, when he inflicted the blow, intended to maim, or was engaged in the commission of, or intended to commit any felony other than the homicide with which he was charged; that fracturing the skull was not maiming, and even if it should be so assumed, as death was likely to result therefrom, an intent to fracture the skull, without killing, could not be predicated of the act; that the requests to charge were therefore irrelevant and inapplicable to the facts, and the court was justified in refusing.

The statutes and authorities defining the crime of *mayhem*, collated and discussed.

(Argued December 16, 1872; decided December 24, 1872.)

ERROR to the General Term of the Supreme Court in the first judicial department, to review judgment of that court affirming judgment of the Court of Oyer and Terminer in and for the county of New York, entered upon a conviction of the plaintiff in error of the crime of murder in the first degree.

The prisoner was indicted for the murder of Avery D. Putnam, in the city of New York. Putnam took the Broadway horse cars on the evening of April 26th, 1871, with a lady and child. At Twenty-ninth street the child looked through the window in front door to see the clock upon the Gilsey House. The prisoner, who stood upon the front platform, opened the door. It was shut. Prisoner opened it a second and third time, and it was as often shut. Finally he came into the car and undertook to sit down by the child, which was prevented. He then began to jeer at Putnam, who took no notice of him. He then asked Putnam how far he was going up, to which he made no reply. Prisoner got up, shut his hand hard down beside him, and said: "Well, I am going as far as you go, and before you leave this car I'll give you hell." After the prisoner got out upon the platform he inquired of the driver if he had a car-hook, who told him he had, and pointed out to him where it hung. Prisoner then said he would learn him his business—when he got off the car he would learn him to keep his place. Putnam and his party got out at Forty-sixth street. As he was helping the lady off, the prisoner, who had seized the car-hook, ran around the car as it stopped, and struck him upon the head with the hook, crushing in his skull, of which wound he died three days thereafter. Prisoner's counsel requested the court to charge several propositions which are set forth in the opinion.

*John K. Porter* for the plaintiff in error. The refusal of the court to charge as requested was error. (*Fitzgerald* v. *The People*, 37 N. Y., 416; *People* v. *Enoch*, 13 Wend., 164; 2 R. S., 665, §§ 36, 39; p. 698, § 3, sub. 2; 2 Whar. Am. Crim. Law, §§ 11, 71; 23 Coke, 62, 118; 1 East Pleas of

Crown, 393 ; Const. of N. Y., art. 1, § 17 ; 2 Reeves' His. of England, 34, 35 ; Bracton De Corvill, fols. 144, 145 ; Glanville, Blain's translation, 350 ; Bk. 14, ch. 1, Britton Nichol's translation, 123 ; *Shorter* v. *People,* 2 Com., 203 ; Laws of 1862, chap. 197 ; *Davey* v. *People,* 10 N. Y., 154 ; 2 Park. Crim. R., 627 ; *Kelly* v. *Commonwealth,* 1 Grant, 493 ; *Ex parte Chauncey,* 2 Ash., 217 ; Wharton on Homicide, 41 [ed. of 1858] ; *Keefe* v. *People,* 40 N. Y., 348 ; 19 Wend., 591–595 ; *People* v. *Eastwood,* 14 N. Y., 564.)

*S. B. Garvin* for the defendants in error. There was no evidence to support the requests to charge ; the refusal was not, therefore, error. (12 Wend., 432 ; 31 N. Y., 338 ; Laws of 1862, chap. 197 ; *Fitzgerald's Case,* 37 N. Y., 427 ; 19 Wend., 605 ; 3 Park. Crim. R., 384 ; 2 Hand., 4.) The alleged error could not have affected the result, and a new trial should not therefore be granted. (*Gonzales' Case,* 35 N. Y., 60.)

Andrews, J. Upon the conclusion of the testimony, the prisoner's counsel requested the court to charge the jury that upon the indictment and evidence the jury could convict the prisoner of murder in the second degree, and further, that if the prisoner killed the deceased by an assault upon him with a dangerous weapon with intent to maim him, but without any intent to effect death, such killing was murder in the second degree.

The court refused to charge either of these propositions, and to this refusal the prisoner's counsel excepted.

This exception presents the only question argued by the learned counsel for the prisoner, and no ground is suggested for the reversal of the conviction and judgment except that the court erred in refusing to charge these propositions.

The court charged the jury that the defendant could not be convicted of murder in the first degree, unless he acted from a premeditated design to effect the death of the deceased, and that in the absence of such an intent, his offence was reduced to manslaughter.

The court, by the ruling upon the propositions of the prisoner's counsel and by the charge, excluded from the consideration of the jury the question whether the prisoner could upon the evidence be convicted of murder in the second degree, and decided, as matter of law, that such a conviction was not warranted by the evidence.

It was the duty of the court to instruct the jury as to the legal effect of conclusions of fact which they were at liberty to deduce from the evidence.

It is the province of the jury to determine questions of fact arising upon the evidence and the intent of the prisoner, but if the facts proved are capable of two constructions, or if in one view of the evidence a particular intent might be found, and yet the facts might justify the finding of an intent involving another degree of guilt, the court was bound, upon the request of the prisoner, to declare the rule of law applicable to the case in either aspect, as the jury might determine the facts.

This rule is fundamental, and is essential to the due administration of the law and to the protection of the accused. It was declared by Judge NELSON, in the case of *The People* v. *Enoch* (13 Wend., 164), as follows :

" It is the business of the court to see that a proper direction be given to the jury, in point of law, upon the evidence."

If there was in this case any evidence tending to prove that the prisoner was guilty of murder in the second degree, the court erred in refusing to give the instruction asked. It becomes necessary, therefore, to consider whether there was such evidence in the case, and, to determine it, we must ascertain what constitutes murder in the second degree.

The division of the crime of murder into two degrees was made by the statute of 1862. (Laws of 1862, chap. 197.) The killing of a human being without authority of law, " when perpetrated without any design to effect death by a person engaged in the commission of any felony," was murder by one of the definitions of that crime, contained in the Revised Statutes. (2 Rev. Stat., 657, § 5, sub. 3.)

By the amendment of 1862, the killing of another by a person engaged in the commission of a felony was made murder in the first degree only when perpetrated in committing the crime of arson in the first degree.

The other cases embraced in the definition of the Revised Statutes, above cited, were made murder in the second degree. The law of 1862 declares "that such killing, unless it be murder in the first degree, or manslaughter, or excusable or justifiable homicide,  *  *  *  or when perpetrated without any design to effect death by a person engaged in the commission of any felony, shall be murder in the second degree."

It was decided in *Fitzgerrold's Case* (37 N. Y., 413) that, under this statute, those cases only were murder in the second degree in which the killing was by a person engaged at the time in the commission of a felony other than arson in the first degree.

The question we are now considering depends, therefore, upon the fact whether the evidence discloses or tends to establish that the prisoner, when he inflicted upon Putnam the blow which resulted in his death, was engaged in the commission of a felony, within the purview of this statute. The prisoner when he struck the deceased intended to inflict a personal injury.

If any felony, therefore, was intended by the prisoner, other than the killing of the deceased, it was a felonious assault upon him.

It is claimed on the part of the people that the words "engaged in the commission of any felony," in the statute, do not include cases in which the killing resulted from intentional violence to the person killed, and where, although the intent was to commit a felonious assault, there was no intention to kill; or, in other words, where the felony intended, although not the felony of homicide, was the very act of personal violence which caused the death, that this is not a felony within the meaning of the statute.

A question of the same character has arisen upon the construction of the provision of the statute declaring that the

killing of a human being, without a design to effect death by the act, etc., of another, while such other is engaged "in the perpetration of any crime or misdemeanor not amounting to felony," shall be manslaughter in the first degree. (2 R. S., 661, § 6.) It has given rise to much discussion, and different views have been expressed upon it by judges, but it has never been determined by the court of last resort. (*People* v. *Rector*, 19 Wend., 608; *Darry* v. *People*, 10 N. Y., 120; *People* v. *Butler*, 3 Park. Crim. R., 377.)

What the true construction of the statute is, is immaterial in this case, unless the evidence warranted the inference, or unless the jury might have found from the evidence, that the prisoner when he struck the deceased intended to commit some felony other than the homicide with which he was charged.

We think that there is no evidence that the prisoner committed or intended to commit any felony other than the felony of homicide   That he intended to inflict a personal injury upon the deceased, is admitted. But an assault and battery upon another is a misdemeanor, except only in the cases where by statute the offence is made a felony. This was so at common law, and the offence was a misdemeanor simply, although the assailant may have had a felonious intent; as an intent to murder or to rob when he inflicted the injury. If the felony attempted was accomplished, then the misdemeanor was merged in the higher offence.

The Revised Statutes declare (2 R. S., 665, § 36) that "Every person who shall be convicted of  *  *  *  an assault and battery upon another, by means of any deadly weapon  *  *  *  with the intent to kill, maim, ravish or rob such other person, or in an attempt to commit any burglary, larceny or other felony,  *  *  *  shall be punished by imprisonment in a State prison for a term of not more than ten years."

The offences described in this section are felonies within the meaning of that term, as used in the statute defining the crime of murder. (2 R. S., 702, § 30.)

If the prisoner was engaged in the commission of any felony other than homicide when he struck the deceased, it must have been one described in this section, as an assault and battery is not made a felony in any case not within it.

We have not overlooked the act of 1854 (chap. 74), which makes an *assault* with "any knife, dirk, dagger or other sharp, dangerous weapon," etc., punishable by imprisonment in the State prison or in a county jail. This offence is not a felony within the statute or at common law, and the act relates to assaults only, and with an instrument different from the one used by the prisoner. (*Fassett* v. *Smith*, 23 N. Y., 252.)

And we have no comprehensive statute like that of 9 Geo. IV., chap. 31, which makes an unlawful wounding with intent to do some great bodily injury a felony.

None of the specifications in the section of the statute relating to felonious assaults are applicable to this case, unless the act of the prisoner can be construed to have been an assault with attempt to maim.

Unless the prisoner was guilty of an attempt to commit that felony, there is no other to which his act can be referred, except that of murder in the first degree or manslaughter.

The prisoner intentionally aimed a blow at the head of the deceased with a dangerous weapon, and with a force likely to fracture the skull, and which in fact did crush it; and it is insisted that upon this evidence, and in the absence of any proof of antecedent or subsequent facts tending to establish it, the jury might have found that the prisoner's intent was to fracture the skull or injure the head, and not to kill, and if such intent had been found, there was an assault with an attempt *to maim*, within the statute. *Mayhem* at common law is defined by Blackstone as the violently depriving another of the use of such of his members as may render him less able in fighting either to defend himself or to annoy his adversary. (4 Black., 204.)

It was recognized as a felony at a very early period of the common law, and the offender was punished by the loss of the

same member of which he had deprived the party maimed: *membrum pro membro.*

It was treated as an offence against the State, for the reason assigned by Lord COKE (1 Inst., 127): "For the members of every subject are under the safeguard and protection of the law, to the end a man may serve his king and country when occasion shall be offered."

The special injuries which constitute *mayhem* are stated, by Hawkins, as follows:

"And therefore the cutting off or disabling or weakening a man's hand or finger, a striking out his eye or foretooth, or castrating him, are said to be maims; but the cutting off his ear or nose are not esteemed maims, because they do not weaken, but only disfigure him." (1 Hawkins' Pleas of the Crown, 107.)

And Blackstone treats it as an injury resulting in a permanent disability, and says it is attended with this aggravating circumstance, that thereby the party injured "is forever disabled from making so good a defence against future external injuries as he otherwise might have done." (3 Bl., 131.)

An injury to the head or skull is not specified by Hawkins or Blackstone as *mayhem;* and as the usual consequence of such an injury is either death or temporary disability, it does not seem to be embraced within the definition of that crime as given by these commentators.

In the definition of *mayhem* by Lord Coke, the breaking of the skull is included.

"Mayhem," he says, "signifieth a corporal hurt, whereby a man looseth a member by reason whereof he is less able to fight, as by putting out his foretooth, *breaking his skull,* striking off his arm, hand or finger, cutting off his leg or foot, or whereby he looseth the use of any of his said members." (Coke Litt., 288 *a.*)

And Lord COKE refers to the authority of Glanville and Britton in support of this definition:

"Mayhem," says Glanville, "signifies the breaking of any bone or injuring the head by wounding or abrasion. In such

case the accused is obliged to purge himself by the ordeal, that is, by the hot iron, if he be a freeman; by water, if he be a rustic." (Glanville, Blain's translation, book 14, chap. 1, 350; see, also, Britton, Nichols' translation, liv. 1, chap. 26, fol. 48 *b*, 49 *a*, 123.)

Some recognized instances of mayhem are omitted in Glanville's definition, and it would seem to include any injury to the head, however trivial. But no authority has been cited, subsequent to the time of Lord COKE, nor has any come to our notice, for the proposition that a fracture of the skull is mayhem, except that Mr. East, in his Pleas of the Crown (p. 393), after giving the general definition of mayhem at common law, and instances in illustration of it, concludes, " or, as Lord COKE adds, breaking the skull."

But whatever acts may have been recognized as mayhems, at a remote period of the common law, the crime and the punishment became the subject of statute definition and regulation. Some statutes had been passed upon the subject prior to the reign of Car. II, but the first general and comprehensive one was the statute 22 and 23 Car II, chap. 1, entitled "An act to prevent malicious maiming and wounding."

Chitty speaks of it as the most important and extensive ancient statute upon this subject. (Criminal Law, vol. 3, 785.) And Blackstone says that this and the prior statutes " put the crime and punishment of mayhem more out of doubt." (4 Bl., 206.)

By this statute it is enacted that any person who " shall on purpose and of malice aforethought, by lying in wait, unlawfully cut out or disable the tongue, put out the eye, slit the nose or lip, or cut off or disable any limb or member of any subject, with intention in so doing to maim or disfigure him in any of the manners aforesaid," shall be guilty of felony without benefit of clergy.

Whatever may have been the law of *mayhem* in England antecedent to this statute, no case can be found, we think, arising since its enactment, in which an injury to the head,

or any act or injury, has been regarded as *mayhem*, other than the acts and injuries enumerated in this statute.

It has been regarded as defining what before may have been uncertain. And it was held in *Rex* v. *Lea* (1 Leach, 51), where a husband had cut the throat of his wife quite across, that it was not maiming within this statute.

The act of Car. II has been the basis of the legislation of this State on the subject of maiming.

The first act was passed in 1788, and is entitled "An act to prevent malicious wounding and maiming."

This act was followed by the act of 1801 entitled "An act to prevent malicious maiming," which latter act was substantially a re-enactment of the former, except in respect to punishment.

In both statutes the enumeration and description of the injuries which are made punishable is the same as in the English statute, and no others are included.

The Revised Statutes (2 R. S., § 36, 665) declare "that every person who, from a premeditated design, etc., shall, first, cut out or disable the tongue; or, second, put out an eye; or, third, slit the lip or destroy the nose; or, fourth, cut off or disable any limb or member of another on purpose, upon conviction thereof, shall be imprisoned in a State prison," etc.; following the enumeration in the previous statutes.

The statute of Car. II has been followed, also, in the legislation by congress and of many of the States of the Union. (See collection of statutes in Wharton's Criminal Law, title "Mayhem.")

We are of opinion that since that statute the crime of *mayhem* includes those injuries only which are therein enumerated, and that the section of the Revised Statutes above cited was intended as a statute definition of that crime.

It does not declare, in terms, that the acts therein enumerated constitute maiming; but the section is contained in the article entitled "Of rape, maiming, etc.," and the injuries are those which are generally known as maiming, and it includes

all the cases which, since the time of Lord Coke, have come within that designation.

In *Reg.* v. *Sullivan* (1 C. & Marsh, 209) the prisoner was indicted under the act of 7 Wm. IV and 1 Vict., ch. 85, which enacted that any one who shall stab, cut or wound any person, with intent to *maim*, disfigure or disable such person, or to do some other grievous bodily harm, etc., shall be guilty of felony.

It appeared in the evidence that the prisoner with an ax struck the prosecutor on the head with the edge of it, and inflicted a cut upon it.

Parke, B., in charging the jury, said: " There is no proof of an intent to maim or disable, as the.blow was aimed at the head of the prosecutor. It would have been otherwise if it had been aimed at the arm, to prevent his being able to use it. The question, therefore, will be whether there was a wounding with intent either to murder the prosecutor or to do him some grievous bodily harm."

This is a direct authority, and the opinion of an eminent judge, in support of the views herein expressed.

It is to be observed, moreover, that the case did not arise under the statute of Charles, which was repealed by St. 9 Geo. IV., ch. 31; so that it stood upon the construction of the words " to maim," in the statute of Victoria.

We might here close the consideration of this case; but we are of opinion that the result would not be changed although it should be held, according to Lord Coke's definition, that breaking of the skull is or might be a maiming.

The refusal of the court to charge that if .the. prisoner intended to maim, and not to kill, the offence was murder in the second degree, was proper, for the reason that there was no evidence upon which the jury could have found that the prisoner intended to fracture the skull of the deceased, as distinguished from an intent to kill him.

The request assumes that the prisoner acted, in striking the blow after having formed an intent, as to the extent of the injury to be inflicted.

His act was a blow with an iron bar upon the head of the deceased, with a force which crushed the skull and drove it in upon the brain.

There was no evidence from which his intent could be ascertained, except what was furnished by the facts preceding the assault, and by the act itself and its results.

It is a fundamental rule of evidence, of very general application, founded upon observation and experience, that a man is presumed to intend the natural consequence of his acts.

In this case death ensued, as it was likely to ensue, from the act of the prisoner.

And while it was for the jury to determine with what intent the blow was inflicted, we cannot, without doing violence to common sense, say that the prisoner may have intended to break the skull of Putnam without producing death.

Such an intent cannot be predicated of his act, and there is no evidence to establish it.

If the prisoner acted from premeditation he may have intended to kill the deceased or simply to do him a bodily injury; but that he intended the particular injury of breaking the skull only, cannot be inferred.

If a blow aimed at an arm is by accident deflected from its course and inflicts a mortal wound, in such or similar cases, an intent to maim only might be found by the jury; and if, in this case, death had not resulted the prisoner might, perhaps (assuming that the fracture of the head was a maiming), have been convicted of an intent to maim. (East's Pleas of the Crown, title "Mayhem," Vict. I, 400; *Rex* v. *Cooke*, 1 St. Tr., 54.)

But the request to charge was irrelevant and inapplicable to the facts, and the court was justified in refusing to grant it.

The jury have by their verdict found that the prisoner, when he struck the blow, intended to kill the deceased.

By necessary inference the jury must have found that the prisoner was not, at the time of the act, engaged in the commission of any felony other than the homicide of which he was convicted.

If the court erred in refusing to charge as requested, yet it does not appear that the prisoner could have been prejudiced thereby; and especially, in view of the further fact, that the court charged that, unless the intent to kill was found, the prisoner could be convicted of manslaughter only. But we prefer to rest our decision upon the other grounds indicated.

After a careful consideration of the questions of law arising upon this record, we are of opinion that the judgment must be affirmed.

The question is new, and the case is a proper one to have been brought here for final adjudication; and while no errors are trivial in a judgment involving life, it is to be remembered that the law of murder is designed for the protection of life from lawless violence, and its sanctions ought not be weakened by reversing convictions upon objections which are unsustained by reason or authority.

The judgment is affirmed.

All concur.

Judgment affirmed.