MARTIN GODFREY, JR., PLAINTIFF IN ERROR, *v*. THE PEOPLE OF THE STATE OF NEW YORK, DEFENDANTS IN ERROR.

*Mayhem — biting off external ear — evidence of premeditation to justify conviction of — Examination of prisoner before committing magistrate — when admissible.*

What allegations in an indictment are sufficient to sustain a conviction of mayhem, considered.

The external ear is a member of the human body within the meaning of the statute of mayhem.

If, at the instant of biting, the prisoner intends to take the external ear off with his teeth and does so, he is guilty of sufficient malice aforethought and premeditation, to justify his conviction of mayhem, if the other facts in the case lead to such a result.*

* See *Burke* v. *People*, 4 Hun, 481. — [REP.

*Semble,* that when the prisoner signs his examination, taken down before the committing magistrate, who testifies positively that he either read it to him or that it was read to him by the clerk, such being the settled and uniform practice of his court, it is sufficient to justify its admission in evidence.

WRIT of error to review the conviction of the plaintiff in error of the offense of mayhem.

The plaintiff in error was indicted in the Court of General Sessions of New York for mayhem; pleaded "not guilty" to the indictment; was tried before the city judge and a jury, and was convicted and sentenced to the State prison for the term of seven years.

The indictment alleged:

" That Martin Godfrey, late of the First ward of the city of New York, in the county of New York aforesaid, on the 15th day of July, in the year of our Lord, 1874, at the ward, city and county aforesaid, with force and arms in and upon one Robert Southern, in the peace of the said people then and there being, feloniously, wickedly and of his malice aforethought, did make an assault, and that he, the said Martin Godfrey, the left ear of him, the said Robert Southern, with the teeth of him the said Martin Godfrey, then and there feloniously, willfully, from premeditated design and on purpose, did bite off, disable and destroy."

And so the jurors aforesaid, upon their oath aforesaid, do say, that the said Martin Godfrey, late of the ward, city and county aforesaid, on the day and in the year last aforesaid, at the ward, city and county aforesaid, him, the said Robert Southern, with force and arms, willfully, feloniously, of his malice aforethought, and on purpose, did maim against the form of the statute in such case made and provided, and against the peace of the people of the State of New York, and their dignity.

It appeared upon the trial that a dispute arose between Godfrey and Southern, while playing a game of cards in a saloon. At the conclusion of the game, Godfrey used insulting language to Southern, when Southern asked him if he wanted to fight. Godfrey then struck Southern, when they clinched and fell upon the floor fighting. During the struggle Southern lost the greater portion of his left ear. The prisoner claimed that it had been taken off by the edge of a table against which Southern fell during the scuffle. Southern

testified : " As we clinched, I felt him trying to get a chew at me; says I to him, 'Martin, don't you bite.' " Another witness also testified, that he heard Southern tell the prisoner not to bite him.

*Wm. F. Howe,* for the plaintiff in error. The cutting off the ear, nose or the like, would not, at common law, be mayhem. The only conflict between the offense at common law and the provisions of our statute relating to the same offense are, that the statutes add to or multiply cases of the like character. It is a well settled principle of law that if an enactment is, in its nature, declaratory of the common law, it will be construed, as far as may be, according to the common law. (*Freeman* v. *The People*, 4 Denio, 9, 29; *Commonwealth·* v. *Humphries*, 7 Mass., 242; *People* v. *Butler*, 16 Johns., 203; 2 Bish. on Crim. Law [3d ed.], § 176; also, see, 1 Kent's Com., 464; *The People* v. *Goshen Turnpike Co.*, 11 Wend., 596; *The People* v. *Mather*, 4 id., 229.) When particular words are followed by general ones — as if, after an enumeration of several classes or things, there is added, and all others — the general words are restricted, in meaning, to objects of the like kind with those specified. (*Rex* v. *Gillbrass*, 7 Car. & P., 444; *Rex* v. *Harris*, id., 446; *Rex* v. *St. George*, 9 Car. & P., 483; 1 East Pleas of the Crown, 187, 188; *Reg.* v. *Reed*, 23 L. T., 156; 28 Eng. L. and Eq., 133; 1 Bish. on Crim. L., § 275; *Reg.* v. *Whitnash*, 7 B. & C., 596; Smith's Com., 172; 28 English Law and Equity, 133; *Rex* v. *Atkinson*, Russell & Ryland, 104; Russ. Crimes [Grea. ed.], 728; *Rex* v. *Atkinson*, 1 Russ. Crimes [Grea. ed.], 729; Russell & Ryland, 78; *Rex* v. *Whitfield*, 1 Russ. Crimes [Grea. ed.], 728; 1 Bish. Crim. Law [3d ed.], § 330; *Rex* v. *Harris*, 7 Car. & P., 446; *Coolidge* v. *Choate*, 11 Metc., 79; *Danforth* v. *Woodward*, [10th ed.], 423; *Buckingham* v. *Billings*, 13 Mass., 82; *Patten* v. *Shepard*, 4 Conn., 450.) The indictment did not charge the plaintiff in error with having committed the offense of mayhem. The defect was not and could not be supplied by the evidence, and could not be cured by the verdict. (*Ruloff* v. *The People*, 18 N. Y. [4 Smith], 180; *The People* v. *Bennet*, 49 N. Y., 137.) It is a well established rule in criminal pleadings that all material facts and circumstances comprised in the definition of the offense, by rule of the common law or by statute, must be stated, and if any one

material fact or circumstance be omitted the indictment will be bad. (2 Hale, 183, 184; Bacon's Ab., Indict., G. 1; 4 Tenn., 634; 5 East, 258; *Lambert* v. *The People*, 9 Crown, 578; 1 Waterman's Archbold [6th ed.], 85; 2 Chitty's Crim. Law, 171, 173, 281, 289; *The People* v. *Wilber*, 4 Parker's Crim., 19; *Wood* v. *The People*, 9 Barb., 671; *Briggs* v. *The People*, 8 id., 547; *The People* v. *Enoch*, 13 Wend., 172, 173; *Wood* v. *The People*, 53 N. Y., 511; Hale's Pleas of the Crown, 628; Foster's Crim. Law, 423; Hawkin's Pleas of the Crown, chap. 23, § 77; chap. 25, § 110; 3 Chitty's Crim. Law, 812; 1 Russ. on Crimes, 686; Barbour's Crim. Law, 73, 332; *People* v. *Enoch*, 13 Wend., 172.) In all cases in which the statute provides that if an offense is committed " by certain means," or in a " certain manner," the indictment must charge that the means were employed, or the manner followed, and the omission to do so will be deemed error, and the conviction will be reversed. (*Enright* v. *The People*, 21 How. Pr., 383; *People* v. *Davis*, 18 id., 134; 4 Parker's Crim., 61; *O'Leary* v. *The People*, id., 187; *Commonwealth* v. *Barlow*, 4 Mass., 439; *Fellinger* v. *The People*, 15 Abb. Pr., 128; 24 How., 341.) Where the intent, or premeditation, with which an act is done, forms a material ingredient in an offense, it must not only be laid in the indictment, but it must be proved as laid. (Waterman's Archbold, 119; *The People* v. *White*, 24 Wend., 520; *Sullivan and Clark* v. *The People*, 1 Parker's Crim., 347; *Wilson* v. *The People*, 4 id., 619; *The People* v. *Lamb*, 2 Keyes, 360; *The People* v. *Johnson*, 1 Parker's Crim., 564.)

*B. K. Phelps*, district attorney, for the defendants in error. It is not necessary to allege in the indictment the means by which premeditation is " evinced; " that is shown. (Sir John Coventry's Act, 2 Bish. Cr. L., 1003.) It is not necessary to aver that the ear is a member of the human body. There is no doubt that the law will take judicial notice of the limbs and members of the human body — of any thing that is uniform, settled and certain, and not merely accidental. (*Clementi* v. *Golding*, 2 Camp., 25; *Commonwealth* v. *Kneeland*, 20 Pick., 239; Stephen on Plead., 353.) The question of how the wound was inflicted was not one for scientific opinion. It was a question of fact for the jury after availing them-

selves of all evidence, scientific and otherwise, bearing upon the case. (*Kennedy* v. *The People*, 39 N. Y., 245; *Wilson* v. *The People*, 4 Park., 619.)

BRADY, J.:

The plaintiff in error was indicted for maiming Robert Southern, the complainant, by biting off the greater part of his left external ear. He was convicted and sentenced to seven years imprisonment. Many exceptions were taken during the trial, but they were either frivolous or taken to questions which, not being answered, were abandoned, or founded on objections which were remedied at the moment or subsequently, and are consequently valueless to the plaintiff in error. For example, the plaintiff in error put Dr. White upon the stand to show that, from the appearance of the part of the ear bitten off, it was his opinion that it was torn off; and the design of the testimony was to sustain a theory of the defense, that the complainant, during the affray with the prisoner, fell against a table, and, as the result, lost that portion of his ear which was torn off, by the collision or contact with the table. The expression of the opinion thus sought was objected to, and the district attorney and court strenuously essayed to prevent its utterance and admission. The court gave full permission to the prisoner, nevertheless, to prove the appearance in detail of the severed part of the external ear and what was left of it upon the head of the complainant, proclaiming the doctrine meanwhile that the jury could judge as well as the doctor whether it was bitten off or torn off. This evidence, notwithstanding, was finally given, and the doctor not only expressed his opinion on that subject, but went still further and said that the portion taken off could not have been bitten off.

The only exception to be withdrawn from this generalization, is that taken to the admission of the complaint and the examination presented to and made before the police magistrate. It is based on the proposition that sufficient foundation was not laid for its reception; in other words, that it was not clearly proved that the examination was read over to the prisoner. There was, however, quite sufficient to establish the fact *prima facie*. The prisoner signed it, and in the presence of the police magistrate, who was positive

that he either read it to him or that it was read to him by the clerk, such being the settled and uniform practice at his court. The presumption arising from the prisoner's signature to the examination, coupled with his presence at the court and the practice referred to, was quite sufficient to authorize the court below to receive it in evidence. The prisoner did not deny that he signed it, or question it in any way, although a witness on his own behalf. It may also be said, that from the mode in which the trial was conducted, it is perfectly apparent that even if the papers were improperly received, they had no influence upon the verdict rendered. The complaint was admitted, as the court stated, not as evidence of facts averred in it, but as a part of the preliminary proceedings, and the examination was admitted to explain it and the answer of the prisoner to the questions put to him. The only pertinent question put to him was: " Have you any thing to say, and if so, what, relative to the charge here preferred against you?" And the answer was: "I have nothing to say at present."

Although the trial was marked by peculiar features in the receipt of the evidence, in the manner in which the rulings were made, and in the general control and guidance of the prosecution and defense, yet the prisoner had all the rights accorded him to which he was entitled, and was fairly and impartially dealt with in the charge of the learned judge presiding. The defense was striking, because it presented the seeming anomaly of a theory of innocence, independently of the prisoner's denials of the act charged, wholly unsupported by any evidence except that of Dr. White, namely: that the complainant struck against a table in falling, and by contact with it tore away his ear.

A careful examination of this appeal shows, therefore, that there are but two substantial questions to be decided, and they are: First. Was the indictment sufficient to charge the crime of mayhem, under our statute? Second. Did the act done, viewed with all the attending and surrounding circumstances, constitute that offense?

The statute under which the prisoner was indicted is as follows: "Every person who, from premeditated design, evinced by lying in wait for the purpose, or in any other manner, shall (1) cut out or disable the tongue, or (2) put out an eye, or (3) slit the lip, or slit

or destroy the nose, or (4) cut off or disable any limb or member of another, on purpose, shall be imprisoned," etc. It is apparent that the offense contemplated is the commission of any one of the acts named, from premeditated design, and whether that design is evinced by lying in wait for the purpose, or in any other manner, is a matter not of pleading but of proof. The crime against which the statute is directed, is the commission of the act charged from premeditated design, and when, in an indictment, the offense charged is thus pleaded, it is sufficient to designate the statutory crime and advise the alleged offender of the accusation made against him. Whether the crime has been committed must depend upon the design, to be established by proof, which may be of lying in wait for the purpose, or in any other manner which affords satisfactory evidence of the premeditated design. It was not intended to limit the offense to instances of lying in wait, but to embrace every one of the acts mentioned, done from premeditated design, however that design might express itself, whether by lying in wait or in any other manner. It is not necessary, perhaps, to say that the existence of premeditated design might be shown by facts and circumstances which would be equally as conclusive as the lying in wait, and hence the addition of the words in the statute, "or in any other manner." The legislature must be presumed to know that such an offense could be planned and executed by an infinite variety of ways in the mode of procedure, none of which would necessarily include the lying in wait. A very high order of ingenuity frequently marks the conception and commission of crime, and renders it difficult, if not impossible, some times to discover the offender. It is very apparent, however, that the indictment in this case was sufficient. It charged that the prisoner did feloniously, wickedly, and of malice aforethought, make an assault upon the complainant with his teeth, and did feloniously and willfully, from premeditated design and on purpose, bite off, disable and destroy the left ear of the complainant. And that the prisoner did, with force and arms, willfully, feloniously, of his malice aforethought, and on purpose, maim the complainant, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York and their dignity. The whole object of criminal pleading is to advise the accused of

the offense with which he stands charged, and where this is done the courts should not vigorously search for technical omissions, or lend an ear or eye to them. The shortest and plainest way of telling the story is the one best adapted, not only to our forms in the administration of criminal justice, but in all the business affairs of life. A concise statement of facts answers for the civil side of the calendar, and is abundantly safe for the prisoner and the people on the criminal side of it. The prisoner was fully apprised of the offense charged against him by the indictment, which was, that he bit off the ear of the complainant from a premeditated design, and on purpose, and thus maimed the latter contrary to the statute in such case made and provided. The forms of pleading adopted in England when pleading was regarded as a science, and consequently the delight of the special pleader, do not now entirely prevail with us, and the earlier precedents must succumb to the advance made in the presentation and examination, not only of the affairs of men, but of the crimes they commit. A simple and concise statement of the crime imputed is all that should be required. These views dispose of the first question, and adversely to the plaintiff in error.

The second question is one which may not be treated with the same ease as the first, and yet it does not seem to present any serious difficulty. The doctrine of mayhem has recently been the subject of judicial exposition. In the case of the *People* v. *Foster* (50 N. Y., 598), it was elaborately considered by Justice ANDREWS, in an able and comprehensive opinion. There is, however, nothing in that case bearing upon the question presented here. Whether cutting off or disabling an ear is within the statute, has not been definitely considered in any adjudicated case in this State, and whether it is or not, depends wholly upon the interpretation which may be given to that enactment. It must be so, because at common law it was not mayhem to cut off an ear, because it did not weaken, but only disfigured the victim. (*Foster's Case, supra.*) The ear is not specifically named in the statute, and, if embraced therefore within the law referred to, is covered by these words: " Cut off or disable any limb or member of another, on purpose."

The words, premeditated design, would seem to apply only to the injuries particularly mentioned, namely, to " cut out or disable the tongue, or put out an eye, or slit the lip, or slit or destroy the

nose," because they are not employed as to the rest of the section upon a strict construction of it. It proceeds thus: " Or cut off or disable any limb or member of another, on purpose," etc. This may not be important except as an indication that the crime against which the statute was arrayed included any limb or member of the human body. The suggestion, which at this stage at once presents itself, is this: Is not the external ear a member of the human body? On that subject, the court said to the jury: "Perhaps I should say, in conclusion, if the complainant's ear was a member of his body within the meaning of the statute, that the severance of such part, or so much of it as appears beyond question or dispute to have been severed in some way or manner, in my opinion, disabled that member, within the meaning of the statute;" and thus apparently left it to them to determine whether it was a member of the body. But it must be assumed here, from the charge of the court and the rulings upon the subject, that the court declared the external ear to be a member of the human body, and its destruction or disablement, in the manner contemplated by law, a crime within the statute referred to.

The functions of the external ear are discussed by Dr. Flint in his very able treatise on the Physiology of Man (vol. 5, p. 196, *et seq.*). It is also described by Longet, in his Traité de Physiologie (vol. 3, p. 14, *et seq.*), and from which, even at the expense of being prolix, the following extracts are made: " The aerial waves which reach the external ear may strike upon the pavilion, or pass directly into the auditory canal. In animals in which the ear has the form of a trumpet more or less flaring, it is easy to explain how this part, receiving a great number of sonorous waves, reflects them and directs them toward the tympanum. In man, the cavity of the concha and the origin of the auditory canal are able, to a certain degree, to serve for this purpose. But all the rest of the curved and irregular surface of the pavilion does not seem adapted to fulfill this end. Nevertheless, Boerhaave made upon this point researches and calculations which tend to prove that the sonorous waves, falling upon all the prominences of the external ear, *are reflected to the auditory passage.* According to this observer, the different salient lines which form these prominences present a parabolic curve, the form of which corresponds to the interior itself of this canal.

Thus it is known that a parabola has the property of reflecting all the rays parallel to its axis, which fall upon the concavity of the curve, so as to direct them to its focus; it follows from this that *the sonorous waves which strike the different prominences of the external ear, must, by their reflection, be conveyed and collected in the auditory canal.*

" The pavilion of the ear has another office not less important; that is, to serve as a conductor of sonorous vibrations, which, striking perpendicularly to its surface, produce vibrations of its proper substance. These vibrations are propagated progressively to the auditory canal, to the membrane of the tympanum, and as far as the interior of the ear. Savart has demonstrated this fact by the aid of ingenious experiments; and, further, he has observed that the numerous inequalities of the pavilion would have the effect of always normally presenting a part of their surface *in the direction of the sonorous waves,* whatever the point of departure of the latter might be.

" The experiments of Schneider are fully confirmatory of the researches of Boerhaave and the facts indicated by Savart. Having obliterated the external eminences and depressions of the pavilion of the ear by filling the depressions with wax, Schneider noted in his own person a marked *enfeeblement of auditory sensation* as regarded all the sonorous waves which did not penetrate *directly into the auditory canal.* This result was still more marked when the concavities of the internal surface of the concha were also filled with wax. If the concha of the two ears be thus covered with wax, it becomes impossible to ascertain from which side sounds come, unless one of the auditory canals be precisely *in the direction of the sonorous body.*

" To sum up, the pavilion of the ear reinforces sounds, either in collecting the sonorous waves which impinge upon its surface, or in transmitting the vibrations themselves to the walls of the auditory canal. It is to be presumed that having an equal aptitude for the reinforcement of all sounds, this cartilaginous body never vibrates in unison with any of them, and that it has no proper sound; an advantage which very probably results from the different irregularities of its surface."

It thus appears, by reference to standard authors, that the external ear performs the important function of collecting, arresting and

conveying the waves of sound to the auditory canal, and that without it they would not be thus carried, unless *in the direct line of the auditory canal*, which commences at the orifice of the ear. And thus, also, it appears, that the proposition maintained as a part of the common law, that the cutting off of an ear was not a maim, but a disfigurement only (1 Hawk. Pl. C., 107), is an absurdity founded upon misapprehension.

The external ear of all animals is important — indeed, it may be said indispensable — for the security and enjoyment of life. In many animals of the lower order, it is extremely flexible, and by its muscular construction easily moved in various directions, so that it may be turned at once to the source from whence the sound proceeds. In man the head is turned to the direction of sound, and his intelligence puts him upon inquiry as to its cause, origin, or source. The rabbit and the deer move away at once, when a sound is heard, unless familiarized with it by experience. If a man's left ear be so disabled that the waves of sound will not reach the auditory canal unless on a direct line with it, it is apparent that he may be exposed on that side to a multitude of dangers. Such an injury, as demonstrated by these medical writers, as we have seen, is therefore a deprivation of the ability to hear sounds which would otherwise be perceptible, and would consequently enable an adversary to approach unobserved, and thus make the person injured less able, in fighting, either to defend himself, or annoy his adversary. It also exposes him to many perils from which his external ear, acting with the powers given by the Great Ruler of the Universe, through the pavilion and otherwise, would protect him. The very instant we arrive at the conclusion, therefore, that the sense of hearing is affected by the cutting off of the external ear or pavilion, or the greater part of it, we must admit the great importance of that appendage or appurtenance as a member of the body, the violent disablement of which should be severely punished.

It is true that on the trial there was no proof that the external ear was a member of the body. The learned judge presiding referred to it as stated, and it necessarily follows, in the absence of proof, that unless the court could take judicial notice of the fact, the conviction of the prisoner was erroneous. There can be little doubt that the court was entirely justified, by the uses and

purposes for which it was designed, to take such notice. There is just as much propriety in that, as in the assumption that a leg or an arm is a member of the body. Courts often take judicial notice of facts much less important and less palpable, such as the local divisions of a county and the relative positions of such divisions; the ordinary duration of human life, as a scientific fact; the meaning of English words and terms of art; and other facts of universal experience and acceptance. (*Lanahan* v. *The People*, 3 Hun, 167, 168, per DAVIS, P. J.)

The word, member, is defined by Worcester: "A limb; a part appurtenant to the body; a subordinate part of the main body." "The tongue is a little member that boasteth great things." "The body consists of many members." "A limb is a member, but members are not always limbs." In Johnson and Walker, member is defined: "Limb; a part appurtenant to the body." If we consider the external ear alone in reference to its functions, as we would an arm or a leg, then it is apparent that the courts, within their sphere on that subject, can take judicial notice that it is a member of the body; but if it be considered in connection with the given definition, it is not to be well doubted that it is a part appurtenant to the body, a member, and within the statute relating to maims. It could not be said of a man whose external ear was cut off, that he was perfect in *physique*, but it would be entirely proper to say that he had lost one of his members, an integral part of his body, and one not given for ornament, but for use, and an important use; for aid in assault and defense, and for protection against an infinite variety of earthly vicissitudes. For these reasons it is considered that the external ear is a member of the body, and that to bite off the greater part of it, is to disable it and to commit an offense within the statute of maims.

It only remains to say, that the doctrine as to the premeditation required, was correctly stated. It is a familiar rule, that if, at the instant of striking a blow, the aggressor intended to kill, and did kill, it was murder in the first degree, under the former statutes of this State relating to homicides, and for a crime like this, no higher or greater evidence can be required. Whatever would be premeditation on a trial for murder, would

be sufficient premeditation in mayhem. If, therefore, upon the instant of biting, the prisoner intended to take the external ear off with his teeth, and did it, he was guilty of sufficient malice aforethought — sufficient premeditation — to justify the conviction, the other facts leading properly to such a result. It must rarely happen that any person would be deliberately approached by another for the purpose of biting off his external ear, and such a result would, in the great majority of cases, when done, be signalized by a quarrel of some kind. The jury were doubtless much influenced by the proof that the complainant said, "don't bite me" during the scuffle; the prisoner being thus advised of what he was doing, and in time to desist from his purpose. The deed itself is an approach to cannibalism, and atrocious. It would, were it not for this conviction, be incredible that it could be done in this age, in any place where civilization has awakened men to the finer relations of life, although it cannot well be questioned that in moments of passion men frequently act as if there were no refinement, no religion, and become abnormal, brutal and savage. The prisoner proved a remarkably good character, and was recommended to mercy by the jury. His present position comes therefore from the improper use of liquor and card playing, to which he sacrificed his good name and character. Such a sacrifice must be looked upon with regret, but the law must be administered.

DAVIS, P. J., and DANIELS, J., concurred.

Judgment affirmed.