arrived at the intention of the testator, and assuming the views expressed on that subject to be correct, the duty of the appellate court is performed.

The judgment should be reversed.

DANIELS, J., concurred.

Judgment reversed.

---

## THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, v. ALEXANDER B. SWEENEY, APPELLANT.

*Evidence — dying declaration in criminal cases — only such statements, as relate to the condition of the person, at the time of making them, are admissible to show the competency of the dying declarations — when a killing by one engaged in committing an assault in the second degree constitutes murder in the first degree — Penal Code, sec. 183, sub. 3, and 218, sub. 4 — when the failure of the defendant to call a witness to explain criminating circumstances does not raise a presumption of guilt — Code of Criminal Procedure, section 527, as amended by chapter 360 of 1882.*

The defendant Sweeney was jointly indicted with one Smith for murder in the first degree in shooting one Hannan, on the seventh of April. After Hannan was shot he was taken to Bellevue Hospital, where he remained until his decease, on April eleventh. On April eighth he was visited by his mother, and on April ninth by his step-sister. During these visits conversations took place with the deceased in which he made statements concerning the shooting, which were received in evidence as dying declarations. Upon the trial the statements so made by Hannan to each of these persons were offered in evidence before the court and jury, accompanied by additional conversations which were not admissible, both witnesses being allowed to detail fully and minutely all that was said between themselves and Hannan concerning the condition in which he was found. This conversation was received with the avowed purpose of sifting what it was admissible for the jury to consider, from that which should be rejected as incompetent.

*Held*, that although the declarations of Hannan were shown to have been made in the belief of impending death so as to render them admissible, the court erred in allowing the witnesses, for the purpose of showing the competency of the dying declarations, to give the whole conversation, and should have restricted them to what Hannan said, concerning his condition, indicating his expectations and convictions.

At the time he was shot Hannan, who was a night watchman, was sitting in a shed, on a wharf. The defendant and Smith entered the shed and when standing near Hannan, who was partially asleep, Smith discharged a pistol which he had in his hands, the bullet entering Hannan's head above one of

his eyes. In submitting the case to the jury they were permitted, by the charge of the recorder, to convict the defendant of the crime of murder in the first degree, even though there was no intent on the part of himself and Smith to kill, if they were " engaged in the perpetration of the crime of assault in the second degree, or in attempting to commit that crime, and while they were so engaged."

*Held*, that although an extreme construction of the provisions of subdivision 3 of section 183, and subdivision 4 of section 218 of the Penal Code might justify this charge, the court erred in so charging in this case for the reason that there was no evidence on which an inquiry could be made by the jury as to whether an assault within said subdivision 4 of section 218 was contemplated or intended by the parties.

During the trial the other defendant Smith was produced in court by the prosecution, but he was not sworn as a witness either on the part of the people or for the defense, and because of the omission of the defendant's counsel to call and examine him, it was claimed that a presumption arose that the defendant himself was guilty of the crime charged in the indictment. In submitting the case to the jury the recorder referred to the case of *Gordon* v. *People*, decided by the Court of Appeals, and said that it was there decided that if one accused of a crime is required to account for his whereabouts at a particular time, to avoid the force of criminating circumstances, the omission to produce the required evidence is not in law conclusive of the facts in dispute but the force of such circumstances may be left to the jury. The absence of such evidence, the court says, especially when it seems to be in the power of the prisoner to furnish it, creates a strong presumption of his guilt and strong inference against him, and is a circumstance greatly corroborative of the truth of the evidence given upon the other side, and in a doubtful case would justify the jury in resolving the doubt against him. That is the language of the Court of Appeals in a murder case, where the court was called upon to lay down the law in reference to the non-production of testimony within a defendant's reach, which might have a material bearing upon the question involved: Now, gentlemen, I read that to you as the law of this State bearing upon this claim, and you will apply that law to the claim on the part of the prosecution in respect to the non-production of this witness, and you will give it that consideration which the Court of Appeals says it is entitled to receive and no more.

*Held*, error; that the doctrine of that case was not applicable to that of the defendant, for the reason that the witness Smith was equally as accessible to the prosecution as he was to the defense, and might have been sworn and examined as a witness by either if his testimony was desirable.

That for these misdirections the verdict should be set aside, and a new trial directed, although no exception had been taken at the trial by the defendant's counsel.

Appeal from a judgment of the Court of General Sessions of the county of New York, convicting the defendant of the crime of murder in the first degree.

*Howe & Hummel,* for the appellant.

*Delancy Nicoll,* assistant district attorney, for the people.

DANIELS, J.:

The defendant was jointly indicted with Peter Smith, and by the indictment he was charged with the crime of murder in the first degree, for shooting John Hannan on the 7th of April, 1885. The evidence established the fact that Hannan was a night watchman at what was called a dumping place, on the wharf at the foot of Thirty-eighth street, in the city of New York. He was at the time sitting upon a bench in a shanty near the place where the dumping was done, and Richard Tracy, a witness for the prosecution, was with him there at that time. That has not only been shown by his own evidence, but the fact was stated in the same way by the defendant in the course of his testimony on his own behalf given upon the trial. While these two persons were in the shanty the defendant and Peter Smith, indicted with him, entered the building, and when standing near Hannan, who was partially asleep, Smith discharged a pistol which he had in his hand and the bullet entered the head of Hannan over one of his eyes. Hannan lived until the eleventh of the month, when he died from the effects of the wound caused by the bullet. After the shooting Hannan was removed to the Bellevue Hospital, where he remained until his decease. On Wednesday, the eighth of April, and the day following the shooting, his mother visited him at the hospital, and on the following day Mary Breslan, his step-sister, in like manner paid him a visit. During these visits conversations took place with the deceased in which he made statements concerning the shooting, which were received in evidence as dying declarations. This evidence has been urged in support of the appeal to have been improperly and unlawfully received. The objection presented to the evidence is, that the statements repeated by the witnesses did not sufficiently appear to have been made in the belief of either immediate or impending death. To permit evidence of this nature to be received upon a criminal trial against a person charged with the offense of murder, the law requires that it shall first be made to appear that the conviction or belief has been produced in the mind of the person making the

statements that his death is near at hand, and that all hope or expectation of recovery shall appear to have ceased to exist. This subject was considered in *Regina* v. *Howell* (26 L. J. M. C., 43). There the person, whose statement was received in evidence, said to the witness: "I have seen Booker, the surgeon, to-day, and he has given me some little hope that I am better, but I don't myself think that I shall ultimately recover," and added, that he should not recover. And from this and the evidence as to his condition, the conclusion was drawn by POLLOCK, C. B., that "the man was suffering from a mortal injury, and he was perfectly conscious of it." And that was deemed to be all that the law required to allow the dying declaration of the injured person to be received. The same rule prevailed in *Mosley and Morrill's case* (1 Lewis C. C., 79), and *Maine* v. *People* (9 Hun, 113) followed this conclusion. The rule is there stated to be that "the person making the statement must have lost all hope of recovery; must have believed that she was about to die. It must have been made under the apprehension of near approaching death." (Id., 115, 116.) In *Brotherton* v. *People* (75 N. Y., 159) the deceased man had stated that he would not recover, and on the day following he was told by his physician that he must die. And as it appeared that such was his belief, the declaration made by him was considered to be legal evidence. In the cases referred to in support of the objection it appeared that all hope of recovery had not ceased to exist when the declarations were made which the courts held not to be admissible. In *People* v. *Robinson* (2 Park., 236) the person whose statements were in controversy was encouraged by the medical attendant to believe and hope that he would recover. The facts were quite similar in *Rex* v. *Van Butchell* (3 Car. & P., 629). While in *Reg.* v. *Jenkins* (11 Coxe C. C., 250; S. C., Law Reps., 1 Crown cases reserved, 187), the statements of the person were rejected for the reason that her declaration was that she had no hope at present of her recovery. Whether this expression did not show at the time an entire absence of hope or expectation of recovery it is not necessary now to discuss. The person making the statement was then in fact in a dying condition and died on the following day, and the rule was very strictly applied, which excluded the declarations made by her inculpating the prisoner as the author of her condition. In *Rex* v. *Crockett* (4 Car.

& P., 545); *Rex* v. *Hayward* (6 id., 157); *Rex* v. *Spilsbury* (7 id., 187); *Regina* v. *Megson* (9 id., 418), the persons whose statements were offered had not abandoned all hope of recovery. And that is true as to the other cases referred to in support of this objection. But in the case now before the court it is quite evident, from the conversations which took place, that Hannan had abandoned all hope of his recovery, and was in the expectation of immediate death, at the time when the statements received in evidence were made by him. The first, which was made to his mother, took the form of the following conversation. He said to her: " ' Mother, will you take me home; the Bellevue people are good enough, but they can do nothing for me.' I said, 'Johnny, the doctors don't think so; the doctors think you will get better.' He replied, 'don't you believe what the doctors tell you, I never will get well.' He says, 'Mother, raise me up.' I did so. He says, 'Mother, kiss me; kiss me, mother, because I am going to die. The bullet that Peter Smith put in my head is in it now and it will soon fetch me and leave you without your only son.' I said, ' Johnny, this is hard.' ' Yes, mother, it is hard, but we can't help it now; I wont last long.' " These statements did prove, as he had received in this manner a mortal wound, that the conviction had settled upon his mind that he was about to die and had no hope whatever of his recovery.

The statements made to his step-sister on the following day were equally as decisive. She testified that while she was with him in the hospital he moaned and she stood up, and he said : " ' Mamie, raise me up.' I raised him up in my arms, and he says ' kiss me,' and I kissed him, and he said ' kiss me good-bye, Mamie.' And I said ' Johnny, don't say that, you ain't going to die.' He said, ' kiss me, Mamie, good-bye.' " She further stated that when she said to him, you are not going to die, he said, " Yes I am, Mamie, I can never get better." On her cross-examination this language was repeated by her. She testified that in answer to her statement to him, you are not going to die, his reply was : " He told me to kiss him good-bye, that he was going to die." His language, she said, was, " kiss me good-bye, I am going to die." And, again : " Kiss me good-bye, Mamie, because I am going to die." These responses by him fully proved that at this time he had no hope whatever of

recovery. The request made to her to kiss him good-bye indicated his conviction to be that he was about to depart from her forever. It was urged, in the course of the argument, as a reason for rejecting this construction of what he said, that she was about to leave the hospital, and that the request to kiss him good-bye was on account of that expected departure. But this position is not maintained by the evidence, for her statement was that she had not told him that she was going away soon, or going to leave the hospital. Neither had he asked her how long she was to remain there. And as the facts appeared there is no reason, therefore, for supposing that his statements referred to any temporary absence, but rather, as the language which he used imported, that he was anticipating his final and early dissolution. And within the authorities which have been cited this permitted his declarations, inculpating the defendants, to be given in evidence. He was at the time suffering from a mortal wound and had become impressed with the conviction that his condition was hopeless, and the time of his decease was near at hand. If any case can be made out satisfactorily in which the dying declaration of a person may be received in evidence, this case appears to have been brought within the rule. But while the statements made by Hannan to each of these persons were admissible in evidence, they were brought before the court and jury accompanied by additional conversations that should not have been received, for both witnesses were allowed to detail fully and minutely all that was said between themselves and Hannan concerning the condition in which he was found. This conversation was received with the avowed purpose of sifting from it what it was admissible for the jury to consider, from that which should be rejected as incompetent, for their deliberation. There was no necessity for receiving the conversations in full for this purpose. What should have been done was to have directed the attention of the witness immediately to what Hannan said concerning his condition, indicating his expectations and convictions. And that could have been done without the slightest embarrassment by restricting the answers of the witness to the proof of that fact. It is probable from the substance of the statements made that the defendant was not injured by this departure from the rules of evidence, and that, on this ground alone, the result of the trial should not be disturbed. But

even if that be the legal view to take of the effect of the evidence, it is still proper that the practice should be disapproved for the reason that other cases may arise which could not, in this manner, be relieved from the effects of the improper evidence.

At the close of the people's case a motion was made by the defendant's counsel for a direction to the jury to acquit him of the charge of murder in the first degree. That was denied by the court, and to its denial the counsel for the defendant excepted. This exception was not well taken, although the defendant was not the person by whose act the mortal wound was inflicted. That was done by Peter Smith, the other defendant. But the evidence was sufficient for the jury to consider and act upon it, which tended to establish the fact that this defendant was acting in concert with Smith before and at the time when the pistol was discharged. The only person besides the defendant and Hannan, who was present and witnessed the occurrence, was Tracy, who was sworn and examined on behalf of the prosecution. His testimony was to the effect that the defendants approached the shanty together, and after entering it whispered together, and the pistol was discharged, and the defendants thereupon left the shanty, passed up the wharf and went into the streets; that he followed them at some distance and finally caused their arrest by two members of the police department. The evidence of this witness has been sharply criticised for the reason that it appeared upon his cross-examination that he had been convicted of a criminal offense. But this offense was that of an assault and battery and did not necessarily tend to discredit his evidence in the case. It further appeared that at the time of the trial he was under an indictment charging him with the offense of larceny from the person; that he had before been tried for the crime of burglary, but was acquitted, and was arrested once for standing on the corner. These facts were not such as would justify the court in rejecting the testimony of this witness, or in declining to submit it for the decision of the jury. Whatever their effect may have been they could extend no further than to tend, in some very slight degree, to subject his evidence to suspicion. And how far they might have any effect in that direction it was for the jury to consider his statements, if they were pertinent at all to that inquiry. That the defendant was

a confederate with Smith the jury might infer from the testimony of this witness, and the further evidence given by the witnesses Fay, Gillespie, Curry and Ryan. From that of Gillespie, it appeared that the defendant and Hannan were fighting together very early on Monday morning, the sixth of April, and that they were separated at the request of Hannan. In the evening of that day Fay stated that he went with Hannan into Gillespie's saloon and there met Sweeney, to whom Hannan said: " 'We better have that fight out now.' Sweeney says 'I'm agreeable.' I says, 'let us have a drink.' So we had a drink, and Hannan says, 'let us go down to the dump and we will finish it.' " But at that time no further conflict took place between these persons. Gillespie, in his evidence, corroborated the statement made by the witness Fay, and even though the former had been convicted and punished for the crime of burglary, his testimony was still proper for the consideration of the jury. Curry, another witness, who had also been convicted of crime, testified that he was at the shanty about five o'clock in the morning of the seventh of April, and that the defendant called there and asked Hannan out; that he went out, and at the distance of about twenty feet from the shanty a conversation took place which he did not hear, but at its close, when the parties were about to separate, Hannan said, if you want any more satisfaction the lot over there is big enough, and that Sweeney then muttered something to himself, and walked away with an awful sour look on him. The other witness made the arrest, and by his evidence corroborated that of Tracy, and in some degree showed the criminality of the defendant, by proof of his denial of the fact that he was at the shanty, or knew anything of this occurrence.

This evidence was such as to indicate the fact to be that the defendant had personal reasons for desiring the ill-treatment of Hannan, and that he accompanied the defendant Smith to the shanty when the shot was fired for the purpose of having that done and thereby gratifying his resentment. Whether the defendant should be convicted of the crime charged in the indictment upon this, and the other evidence proving the wound which was received to have been fatal, it was for the jury to decide. To submit the case to them it was certainly clearly sufficient. (3 Greenl. on Ev., § 41; Wharton on Crim. Law [4th ed.], § 116.) And it was not deprived

of that effect by the testimony of James Sweeney, Jennie Sweeney, the defendant's brother and sister, and Mrs. Sweeney, his mother, stating that he was at home and in bed at the time mentioned by Curry, as that of his meeting Hannan at the shanty. Whether their or his evidence was the most reliable upon this fact was for the jury to consider and decide.

In submitting the case to the jury they were permitted, by the charge of the recorder, to convict the defendant of the crime of murder in the first degree, even though there was no intent on the part of himself and Smith to kill if they were "engaged in the perpetration of the crime of assault in the second degree, or in attempting to commit that crime, and while they were so engaged." This direction was given under the construction placed upon subdivision 3 of section 183, and subdivision 4 of section 218 of the Penal Code. The first of these subdivisions declares the offense to be murder in the first degree, where a homicide shall be committed "without a design to effect death, by a person engaged in the commission of, or in an atttempt to commit, a felony either upon or affecting the person killed or otherwise." And the other section declares an assault "by the use of a weapon or other instrument or thing likely to produce grevious bodily harm," to be an assault in the second degree. And that, by section 221, has been made punishable by imprisonment in a penitentiary or State prison for not less than two nor more than five years, or by a fine of not more than $1,000, or both. And this, according to section 5 of the same Code, will render the offense a felony, for that has been defined to be a crime which is, or may be, punishable by imprisonment in a State prison, and the offense of making such an assault may be so punished. Under this provision, as well as the construction given to the preceding law in *People* v. *Lyon* (99 N. Y., 210), the ruling upon this part of the case was not entirely deprived of legal support. For subdivision 3 of section 183 includes the commission or the attempt to commit a felony upon, or affecting, the person killed. And if such an assault be a felony within this subdivision, and death ensues in consequence of its commission, or the attempt to commit it, under this construction the assailant may be convicted of the crime of murder. This is an extreme construction of the law, which it is not necessary to fully sanction at this time. And it

differs from that which the courts have given to somewhat similar statutory provisions in other decisions which have been made. For in *Fassett* v. *Smith* (23 N. Y., 252) it was declared that a crime, which might be punished by imprisonment either in the State prison or a county jail, was not a felony. And this was approved in *Foster* v. *People* (50 N. Y., 598, 604), in reference to a statute providing for a similar measure of punishment, and in *Thorn* v. *Turck* (94 N. Y., 90). But whatever may be the construction which should be given to these particular sections of the Penal Code, this direction should not have been received by the jury, for there was no evidence in the case tending to establish the fact to be that the defendant and Smith intended only to make an assault upon Hannan, which would inflict grevious bodily harm upon him. What was done on the occasion when these two persons went to the shanty was to discharge the pistol at a vital portion of the body. If they intended to do that, and proceeded to this place for that object, the tendency of the evidence was directly to establish the crime of murder, and not that of a mere assault upon the person who received this wound. And there was, accordingly, no evidence in the case on which the inquiry could be required to be made by the jury, whether an assault within subdivision 4 of section 218 was contemplated, or intended by the parties. In the case of *Foster* v. *People*, already referred to, the court was asked to charge a proposition, including a similar assault, but that was refused for the reason that the case disclosed no evidence rendering that a necessary or proper inquiry on the part of the jury. Upon that subject it was said, in the opinion, that " his act was a blow with an iron bar upon the head of deceased, with a force which crushed the skull and drove it in upon the brain. There was no evidence from which his intent could be ascertained, except what was furnished by the facts preceding the assault, and by the act itself, and its results. It is a fundamental rule of evidence of very general application, founded upon observation and experience, that a man is presumed to intend the natural consequences of his acts. In this case death ensued, as it was likely to ensue, from the act of the prisoner, * * * by necessary inference the jury must have found that the prisoner was not, at the time of the act, engaged in the commission of any felony, other than the homicide of which

he was convicted." (Id., 609.) What was held by the court in that case, concerning the request to charge, is specially applicable to the present case, for there was no evidence, unless the discharge of the pistol was accidental, as a remark mentioned by the defendant in his evidence stated it to be, but which was opposed to the important facts of the case, from which the jury could possibly infer that there was any other design which prompted the use of the weapon than to deprive Hannan of his life. The jury accordingly should not have been required to consider the question submitted in this manner for their deliberation.

During the trial the other defendant, Smith, was produced in court by the prosecution, but he was not sworn as a witness, either on the part of the people or for the defense, and because of the omission of the defendant's counsel to call and examine him, it was claimed that a presumption arose that the defendant himself was guilty of the crime charged in the indictment. And in submitting the case to the jury they were directed by the recorder presiding at the trial that, in the case of *Gordon* v. *The People*, decided by the Court of Appeals, it was held that if one accused of a crime is required to account for his whereabouts at a particular time, to avoid the force of criminating circumstances, the omission to produce the evidence is not in law conclusive of the facts in dispute, but the force of such circumstances may be left to the consideration of the jury. The absence of such evidence, the court says, especially when it seems to be in the power of the prisoner to furnish it, creates a strong presumption of his guilt and strong inference against him, and is a circumstance greatly corroborative of the truth of the evidence given upon the other side, and in a doubtful case would justify the jury in resolving the doubt against him. That is the language of the Court of Appeals in a murder case, where the court was called upon to lay down the law in reference to the non-production of testimony within a defendant's reach, which might have a material bearing upon the questions involved. Now, gentlemen, I read that to you as the law of this State bearing upon this claim, and you will apply that law to the claim on the part of the prosecution in respect of the non-production of this witness, and you will give it that consideration which the Court of Appeals says it is entitled to receive, and no more.

This direction was given upon the ruling made in *Gordon* v. *People* (33 N. Y., 501, 508, 509), and in *People* v. *Hovey* (92 N. Y., 554, 560), the doctrine of that case was approved. But neither of these authorities permitted it to be applied to the case of the defendant, for the witness Smith was equally as accessible to the prosecution as he was to the defense, and might have been sworn and examined as a witness by either, if his testimony was desirable. The defendant, by the evidence, was not placed in either of the positions mentioned in the case of *Gordon* v. *People*, nor in that of *People* v. *Hovey*, and no presumption could legally be indulged against him, on account of his omission to put Smith as a witness upon the stand.

For these misdirections the defendant has the right to complain. They probably had weight with the jury in the decision to which they arrived in the case, and although no exception was taken by the defendant's counsel, it is the duty of the court, under section 527 of the Code of Criminal Procedure, as it was amended by chapter 360 of the Laws of 1882, to set aside the verdict and direct a new trial for the correction of these misdirections. By this section it has been made the duty of this court to order a new trial when the verdict against the prisoner is either against the weight of evidence or against law, or when justice requires that a new trial shall be had. This case is within this section of the Code. It should have been tried and disposed of, without subjecting the inquiry as to the defendant's guilt to either of these directions, for the evidence produced upon the trial was not such as to permit the jury, either in whole or in part, to dispose of the charge contained in the indictment under these directions.

The judgment should be reversed and a new trial ordered.

MACOMBER, J., concurred; BRADY, P. J., concurred in the result.

Judgment reversed and new trial ordered.